**ESTATE OF Rankin M. SMITH, Sr., Suntrust Bank, Taylor W. Smith, and Rankin M. Smith, Jr., Co–Executors, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 07–676T.

United States Court of Federal Claims.

Feb. 13, 2012.

Judith A. Mather, Dow Lohnes PLLC, Washington, D.C., for the plaintiffs. With her were Richard L. Braunstein, Alex L. Bertoldo, and Bernard J. Long, Dow Lohnes PLLC, Washington, D.C., of counsel.

Benjamin C. King, Jr., Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for the defendant. with him were G. Robson Stewart, Assistant Chief, Court of Federal Claims Section, David I. Pincus, Chief, Court of Federal Claims Section, and John A. Di-Cicco, Principal Deputy Assistant Attorney General, Tax Division.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Plaintiffs, the Estate of Rankin M. Smith, Sr., Suntrust Bank, Taylor W. Smith, and Rankin M. Smith, Jr., Co–Executors (hereafter, the Estate), filed suit against the United States pursuant to 28 U.S.C. § 1346(a)(1) (2006), seeking a refund of estate taxes and interest on the value of property included in the taxable Estate of Rankin Smith, Sr. (Mr. Smith).

Plaintiffs allege that the Internal Revenue Service (IRS) incorrectly valued shares of stock held by decedent at the time of his death and of real property owned by Falcon's Nest I, Ltd., in which decedent held an interest, as well as erroneously disallowed deductions for administration expenses paid or incurred by the Estate, including interest payments. The parties have stipulated to two different fair market values for the relevant shares of stock depending on whether 26 U.S.C. § 2704 (2006) applies, and have agreed to the fair market value of the real property at issue owned by Falcons Nest I., Ltd. Upon resolution of the application of Section 2704, the value of decedent's stock includable in the decedent's Estate can be set. This resolution, combined with the parties' settlement of the value of the Falcons Nest I, Ltd. property, can set the value of the gross Estate and, together with the resolution of the remaining issues in the case, will lead to a final judgment. The parties have already indicated that the issues related to allowance of administration expenses have been partially resolved and that they are working to finalize agreement as to the remaining expenses and computations.

In the cross-motions for partial summary judgment, the parties have stipulated that the legal issue to be decided by the court in this opinion is:

> Under the Internal Revenue Code's general estate tax principles, the Estate's Shares are to be valued as Class B Shares for purposes of determining the estate tax. At issue is whether [Internal Revenue] Code section 2704 applies to the automatic conversion of the Company's Class A Shares into Class B Shares upon Mr. Smith's death, including whether the creation of and restrictions on the disproportionate voting rights of the Class A Shares occurred prior to the October 8, 1990 effective date of section 2704.

Under the provisions of the Articles of Incorporation of Mr. Smith's company, The Five Smiths, Inc. (hereafter, the Company), Mr. Smith's Class A shares automatically converted into Class B shares upon his death on October 26, 1997. Class A shares enjoyed the enhanced voting right of 11.64 votes per share, while Class B shares possessed 1 vote per share. The parties have agreed that, if 26 U.S.C. § 2704 applies, as defendant argues, then for purposes of the estate tax, the fair market value of the Class A shares was $30,000,000.00; if, as plaintiffs argue, 26 U.S.C. § 2704 does not apply, then for purposes of the estate tax, the fair market value of the Class B shares was $22,500,000.00. Thus, the applicability or inapplicability of 26 U.S.C. § 2704 determines whether the higher amount will be included in the Estate for estate tax purposes.

In 1965, Mr. Smith formed the Company for the purpose of operating a National Football League (NFL) franchise. Mr. Smith received a franchise from the NFL on June 30, 1965, which he operated until his death on

October 26, 1997. The Company owned and managed the team until it was sold in February 2002.

The Company was taxable as a Subchapter C corporation from its formation in 1965, until December 31, 1986. Prior to December 31, 1986, the parties have stipulated that the Company had issued 23,750 shares of common stock, which represented 14% of the total votes, and another 152,000 shares of voting preferred stock, which represented the remaining 86% of the total votes. The Company determined that it preferred to be taxed as a Subchapter S corporation, and on December 31, 1986, the Company was converted from a Subchapter C corporation to a Subchapter S corporation. The Company's Articles of Incorporation were amended in the Articles of Amendment to the Restated Articles of Incorporation of The Five Smiths, Inc., dated December 31, 1986. In order to convert to a Subchapter S corporation, the Company had to eliminate its preferred stock. Therefore, as a consequence of the 1986 conversion to a Subchapter S corporation, the two prior classes of shares, preferred and common, were converted into two classes of common stock, Class A common stock and Class B common stock, with each class subject to its own Shareholders Agreement. While both classes of stock had voting rights, Class A stock had 11.64 votes per share, and Class B stock had 1 vote per share. This voting rights ratio preserved the relative voting rights between preferred and common shareholders which had existed prior to the December 31, 1986, conversion to the Subchapter S corporation. Preferred shareholders converted their preferred shares into Class A common shares, and retained their enhanced voting power in the Company. Mr. Smith held only Class A stock. The remainder of the Class A stock and all of the Class B stock was held by Mr. Smith's family, or in trusts for the family's benefit. Reflecting Mr. Smith's control of the Company, immediately prior to his death, he held Class A common stock representing 81.75% of the total vote of the combined Class A and Class B common stock of the Company. The associated Shareholders Agreements placed restrictions on the transfer or sale of the Company's stock.

At the time of the 1986 conversion from a Subchapter C corporation to a Subchapter S corporation, of the 13,050 enhanced voting right, Class A shares outstanding, Mr. Smith held 12,424 of the Class A shares and Mr. Smith's family held the remaining 626 Class A shares, as well as all of the 25,000 outstanding shares of Class B stock. At this stage, Mr. Smith's Class A shares (with 11.64 votes per share) gave him 81.75% of the votes of all of the stock outstanding. His family's Class A shares and Class B shares (with 1 vote per share) gave them the remaining 18.25% of the total voting power. As of December 31, 1986, Mr. Smith and his family held 100% of the votes.

Accompanying the 1986 amendment to the Articles of Incorporation of the Company were separate Shareholders Agreements for Class A and Class B stock. The parties stipulated that the December 31, 1986, Class A Shareholders Agreement permitted the Class A shareholders to sell their Class A stock to the Company at the fixed price of $1,176.40 per share, and permitted no other sales of the Class A stock.[1] The Class A Shareholders Agreement also permitted the Company, at the death of a Class A shareholder, such as Mr. Smith, to purchase that shareholder's Class A shares at a price set by the agreement. The sale of Class A shares, or redemption by the Company upon the death of a Class A shareholder, would eliminate the Class A shares and their enhanced voting right. The Class A Shareholders Agreement also permitted Mr. Smith, and other Class A shareholders, to bequeath their Class A shares, with their enhanced voting rights, to their family and/or to other Company shareholders by gift, will, trust, or intestate succession.

In 1990, some of Mr. Smith's children sought to sell a portion of their Class B common stock. Ultimately, third party pur-

---

1. The December 31, 1986, Class B Shareholders Agreement provided that, if a bona fide offer was received from a third party to purchase Class B stock, the Company had a right of first refusal, at the third party price, and for any Class B shares not purchased by the Company, other Company shareholders had a secondary right of purchase, at the third party price.

chaser John Imlay acquired 2,283 shares of Class B stock, pursuant to a February 21, 1991, Stock Purchase Agreement. Third party purchaser Tom Watson Brown also acquired 2,283 shares of Class B stock, pursuant to a March 25, 1991, Stock Purchase Agreement. On March 25, 1991, the Company's Board of Directors and shareholders executed Unanimous Consents approving the February 21 and March 25, 1991, Stock Purchase Agreements for what the parties have called the Imlay–Brown Transaction. Mr. Imlay and Mr. Brown each acquired a 6% interest in the Company through this transaction.[2] To reflect the Imlay–Brown Transaction, a new, single Shareholders Agreement was executed on March 25, 1991, which replaced the December 31, 1986, Class A Common Stock Shareholders Agreement and Class B Common Stock Shareholders Agreement. On March 27, 1991, the earlier December 31, 1986, Articles of Amendment to the Restated Articles of Incorporation of The Five Smiths, Inc., was amended by the addition of an Article VII.[3] The purchase of the shares in the Imlay–Brown Transaction had been conditioned on the Company amending its Articles of Incorporation to provide for the automatic conversion of the Company's Class A shares into Class B shares, on a one-for-basis, upon either (1) the sale or transfer for consideration of any Class A shares during Mr. Smith's lifetime or (2) Mr. Smith's death.

The March 27, 1991, Articles of Amendment, Article VII, implemented the conditions of the Imlay–Brown Transaction, stating:

> Shares of Class A Common Stock shall automatically be converted into shares of Class B Common Stock on a one-for-one basis upon the sale or transfer for consideration of any such shares of Class A Common Stock by the original holder thereof. All outstanding shares of Class A Common Stock shall automatically be converted into shares of Class B Common Stock on a one-for-one basis upon the death of Rankin M. Smith, Sr.

Thus, under the March 27, 1991, Article VII addition to the December 31, 1986, Articles of Incorporation of the Company, in the event of a sale of Class A shares by Mr. Smith, the shares automatically would be converted into Class B shares on a one-for-one basis.[4] In the event of a donative transfer of Class A shares by Mr. Smith to members of his family, the parties have stipulated that the recipients would retain the Class A shares' disproportionate voting rights during Mr. Smith's lifetime. The 1991 provisions, therefore, provided for the automatic conversion of Mr. Smith's Class A shares to Class B shares upon sale of the shares or the death of Mr. Smith. The 1991 Shareholders Agreement also provided that the provisions for converting Class A stock into Class B stock could not be modified, amended or terminated without the consent of Mr. Imlay and Mr. Brown.[5]

After the 1991 Imlay–Brown Transaction, there was no change with respect to the

---

2. After Mr. Smith's death, at one vote per share, Mr. Imlay and Mr. Brown had a 6% interest. Prior to his death and the lapse of Mr. Smith's Class A voting right, Mr. Imlay and Mr. Brown, together, had 2.6% of the total votes.

3. The amended Articles of Amendment were executed on March 26, 1991, and filed with the Georgia Secretary of State on March 27, 1991.

4. Mr. Imlay and Mr. Brown each received a right of first refusal to any proposed sale of Mr. Smith's shares.

5. As noted above, the 1986 shareholders arrangements were associated with the Company's conversion from a Subchapter C corporation to a Subchapter S corporation. The December 31, 1986, Class A Common Stock Shareholders Agreement permitted Class A stock to be sold to the Company at a set price. The 1986 Shareholders Agreement also provided that, upon the death of a Class A shareholder, the Company could, at its option, elect to purchase all of the Class A shares owned by the deceased at the time of death. Thus, under the 1986 Class A Common Stock Shareholders Agreement, the only sales of Class A stock permitted, for consideration, were to the Company, which would have resulted in the elimination of the Class A stock, and its enhanced voting rights. The 1986 Class A Common Stock Shareholders Agreement also permitted Mr. Smith to make a gift of the Class A shares to his family, or to bequeath his Class A shares to his family by will or trust, with the Class A shares retaining their enhanced voting rights.

Class A shares; Mr. Smith still owned 12,424 Class A shares and his family owned 626 Class A shares, for a total of 13,050 Class A shares. However, of the 25,000 Class B shares, Mr. Imlay and Mr. Brown together owned 4,566 shares, leaving 20,434 Class B shares in Mr. Smith's family. Mr. Smith's Class A shares retained for him the same percentage of the total votes, 81.75%. The family's sale of 4,566 Class B shares to Mr. Imlay and Mr. Brown gave the two investors approximately 2.6% of the total votes, and reduced the family's percentage of the total votes from 18.25% to about 15.7% of the total votes. Prior to the 1991 Imlay–Brown Transaction, Mr. Smith and his family controlled 100% of the votes. After the 1991 Transaction, Mr. Smith and his family held about 97.4% of the votes.[6]

Mr. Smith died on October 26, 1997, followed by a complex estate distribution. Pursuant to Article VII of the Company's 1991 Articles of Incorporation, Mr. Smith's 12,424 Class A shares were automatically converted into Class B shares, as were the 626 Class A shares owned by his family. To the family's 20,434 Class B shares were added the 626 Class A shares owned by the family that were converted to 626 Class B shares, for a total of 21,060 Class B shares for the family. The Estate of Mr. Smith received Mr. Smith's newly converted 12,424 Class B shares. The remaining 4,566 Class B shares remained with Mr. Imlay and Mr. Brown. The percentage of ownership of votes is illustrated in the following chart, to which the parties have stipulated. The chart contains no Class A shares, such shares having been eliminated upon Mr. Smith's death:

| Shareholder | Class B Common Shares | Percent of Total Votes |
| --- | --- | --- |
| Estate of Mr. Smith | 12,424 | 32.65% |
| Mr. Smith's Family | 21,060 | 55.35% |
| Mr. Imlay/Mr. Brown | 4,566 | 12.00% |
| TOTAL | 38,050 | 100.00% |

As the above chart demonstrates, Mr. Smith's Estate and Mr. Smith's family together retained 88% of the total votes; Mr. Imlay and Mr. Brown together controlled the remaining 12% of the total votes. Thus, in 1986, Mr. Smith and his family had 100% of the total votes; in 1991, Mr. Smith and his family had 97.4% of the total votes; and in 1997, upon Mr. Smith's death, his Estate and his family had 88% of the total votes.

The parties have stipulated that the applicable valuation date for the 12,424 Class B shares in Mr. Smith's Estate is the date of his death, October 26, 1997. After a complex approval process, plaintiffs and defendant reached a settlement agreement on the fair market values of Mr. Smith's 12,424 Class A shares, and his Estate's 12,424 Class B shares. Subsequently, the court has been informed that both the Joint Committee on Taxation of the United States Congress and

the United States Department of Justice have accepted these valuations. According to the Joint Committee on Taxation, it "finds no reasons to offer any adverse criticism to the proposed partial settlement," such that plaintiffs' valuation offer was "accepted on behalf of the Attorney General." The parties, therefore, have stipulated that the fair market value of Mr. Smith's 12,424 Class A shares, just prior to his death, with their enhanced voting rights, was $30,000,000.00. The parties have further stipulated that the fair market value of the 12,424 Class B shares in Mr. Smith's Estate, after their conversion from Class A to Class B shares on his death, and without the enhanced voting rights, was $22,500,000.00. Plaintiffs propose using the $22,500,000.00 figure to value Mr. Smith's Estate, whereas the defendant asserts that the $30,000,000.00 figure should be utilized to resolve the case.

6. According to defendant, Mr. Smith and his family held 95% of the corporate vote before the lapse.

On January 26, 1999, the Co–Executors of Mr. Smith's Estate, Suntrust Bank, Taylor W. Smith, and Rankin W. Smith, Jr., filed the Estate's Form 706, United States Estate (and Generation Skipping Transfer) Tax Return, with the IRS. The parties reported tax liability of $9,750,765.42 on a taxable estate of $23,516,235.03. On January 25, 2002, the Estate filed its first claim for a refund from the IRS on Form 843, Claim for Refund and Request for Abatement, in the amount of $5,478,849.74, plus interest. The refund claim was based on a $12,730,733.23 reduction in the taxable estate, based on a reduction in the previously reported fair market value of the shares the Estate owned in the Company, and an additional deduction for administration expenses.

On the same day, January 25, 2002, the IRS issued a Notice of Deficiency, asserting a tax deficiency of $13,644,400.00, plus interest. The deficiency was based on an increase in the fair market value of the Estate's shares in the Company from $25,370,000.00 to $48,685,020.00, resulting in a $23,315,020.00 increase in the taxable Estate. The Estate paid $19,290,867.00 to the IRS on March 1, 2002.

The Estate filed a second Form 843, Claim for Refund and Request for Abatement, on September 13, 2002, claiming a refund on the grounds that it had overpaid $15,722,549.00 in tax and interest. The IRS had not acted on the Estate's first refund claim, so the Estate incorporated the first claim into the second claim. On March 23, 2005, the IRS issued a Notice of Claim Disallowance in which both the first and second refund claims were disallowed.

On February 5, 2007, the Estate submitted a payment of $1,385,838.61 to the IRS in order to satisfy its outstanding balance. The Estate filed a third claim for a refund on February 23, 2007, which the IRS disallowed on February 28, 2007. Plaintiffs subsequently filed a complaint with the court, including the claim for a tax refund based on the value of the 12,424 Class B shares included in Mr. Smith's taxable Estate.

## DISCUSSION

### Jurisdiction

The United States Supreme Court has stated that: "A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States District Court or in the United States Court of Federal Claims." *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) (citing 28 U.S.C. § 1346(a)(1) and *EC Term of Years Trust v. United States*, 550 U.S. 429, 431, & n. 2, 127 S.Ct. 1763, 167 L.Ed.2d 729 (2007)); *see also Schlabach v. United States*, 101 Fed. Cl. 678, 682–83 (2011); *Smith v. United States*, 101 Fed.Cl. 474, 477 (2011), *motion for relief from judgment denied*, 2012 WL 346655 (Fed.Cl. Jan. 31, 2012); *Manor Care, Inc. v. United States*, 89 Fed.Cl. 618, 622 (2009) (citing *Flora v. United States*, 362 U.S. 145, 177, 80 S.Ct. 630, 4 L.Ed.2d 623, *reh'g denied*, 362 U.S. 972, 80 S.Ct. 953, 4 L.Ed.2d 902 (1960)); *Shore v. United States*, 9 F.3d 1524, 1527 (Fed.Cir.1993) and 28 U.S.C. § 1346(a), *aff'd*, 630 F.3d 1377 (Fed. Cir.2011); *Strategic Hous. Fin. Corp. v. United States*, 86 Fed.Cl. 518, 530 (citing *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. at 4, 128 S.Ct. 1511), *motion to amend denied*, 87 Fed.Cl. 183 (2009), *aff'd in part, vacated in part on other grounds*, 608 F.3d 1317 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 1513, 179 L.Ed.2d 308 (2011); *Buser v. United States*, 85 Fed.Cl. 248, 256 (2009) ("It is 'undisputed' that the Court of Federal Claims possesses the authority to adjudicate tax refund claims.") (citations omitted); *Radioshack Corp. v. United States*, 82 Fed.Cl. 155, 158 (2008) ("This Court has jurisdiction to consider tax refund suits under 28 U.S.C. § 1491(a)(1).") (citations omitted), *aff'd*, 566 F.3d 1358 (Fed.Cir.2009).

The statute at 28 U.S.C. § 1346, cited by the Supreme Court in *Clintwood Elkhorn Mining*, provides that:

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(1) Any civil action against the United States for the recovery of any internal-

revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws....

28 U.S.C. § 1346(a)(1); *see also Strategic Hous. Fin. Corp. v. United States,* 608 F.3d 1317, 1324 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied,* — U.S. ——, 131 S.Ct. 1513, 179 L.Ed.2d 308 (2011); *Radioshack Corp. v. United States,* 566 F.3d 1358, 1360 (Fed.Cir.2009); *Smith v. United States,* 101 Fed.Cl. at 480 ("It is well established that this Court, and the district courts, lack jurisdiction over a tax refund suit if the full amount of the assessed tax has not been paid at the time the suit is filed." (citations omitted)); *Magma Power Co. & MidAmerican Energy Holdings Co. and Subs. v. United States,* 101 Fed.Cl. 562, 566 (2011); *Wasson v. United States,* 100 Fed.Cl. 798, 800 (2011); *Hartman v. United States,* 99 Fed. Cl. 168, 179 (2011); *Manor Care, Inc. v. United States,* 89 Fed.Cl. at 622 ("It is well accepted that this waiver of sovereign immunity extends to claims based upon the unlawful or erroneous assessment of taxes by the United States. These tax refund suits fall within the jurisdiction of the Court of Federal Claims, provided full payment of any assessment is first made by the claimant to the IRS." (citing 28 U.S.C. § 1346(a), *Flora v. United States,* 362 U.S. at 177, 80 S.Ct. 630 and *Shore v. United States,* 9 F.3d at 1527)); *Buser v. United States,* 85 Fed.Cl. at 256 ("It is 'undisputed' that the Court of Federal Claims possesses the authority to adjudicate tax refund claims.") (citations omitted).

For this court to exercise its jurisdiction over plaintiffs' federal tax refund claim, a petitioning party must first satisfy the tax refund schematic detailed in Title 26 of the Internal Revenue Code, which establishes that a claim for refund must be filed with the

IRS before filing suit in federal court, and establishes strict deadlines for filing such claims. *See* 26 U.S.C. §§ 6511, 7422 (2006).[7] In *United States v. Clintwood Elkhorn Mining Co.,* the United States Supreme Court indicated that:

A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims. The Internal Revenue Code specifies that before doing so, the taxpayer must comply with the tax refund scheme established in the Code. That scheme provides that a claim for a refund must be filed with the Internal Revenue Service (IRS) before suit can be brought, and establishes strict timeframes for filing such a claim.

■ *United States v. Clintwood Elkhorn Mining Co.,* 553 U.S. at 4, 128 S.Ct. 1511 (citations omitted); *see also Radioshack Corp. v. United States,* 566 F.3d at 1360 ("[I]n the context of tax refund suits, the [Supreme] Court has held that the Court of Federal Claims's Tucker Act jurisdiction is limited by the Internal Revenue Code, including 26 U.S.C. § 7422(a)."); *United States v. Dalm,* 494 U.S. 596, 609–10, 110 S.Ct. 1361, 108 L.Ed.2d 548, *reh'g denied,* 495 U.S. 941, 110 S.Ct. 2195, 109 L.Ed.2d 523 (1990); *Buser v. United States,* 85 Fed.Cl. at 256. Moreover, for a refund claim, the court only may hear claims for which the petitioning taxpayer has fulfilled all of his or her tax liabilities for the tax year in question before the refund claim is heard. *Flora v. United States,* 357 U.S. 63, 72–73, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958) (*Flora I*), *aff'd on reh'g,* 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (*Flora II*), *reh'g denied,* 362 U.S. 972, 80 S.Ct. 953, 4 L.Ed.2d 902 (1960). In *Flora II,* the United States Supreme Court reiterated that 28 U.S.C. § 1346(a)(1) requires "payment of the full tax before suit...." *Flora*

---

7. The statute at 26 U.S.C. § 7422(a) states:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a).

*II*, 362 U.S. at 150–51, 80 S.Ct. 630; *see also Computervision Corp. v. United States*, 445 F.3d 1355, 1363 (Fed.Cir.), *reh'g and reh'g en banc denied*, 467 F.3d 1322 (Fed.Cir.2006), *cert. denied*, 549 U.S. 1338, 127 S.Ct. 2033, 167 L.Ed.2d 762 (2007); *Shore v. United States*, 9 F.3d at 1526 ("The full payment requirement of Section 1346(a)(1) and *Flora* applies equally to tax refund suits brought in the Court of Federal Claims . . . .") (citations omitted).

　　█ Essentially, Section 7422(a) functions as a waiver of the government's sovereign immunity in tax refund suits. *See Chicago Milwaukee Corp. v. United States*, 40 F.3d 373, 374 (Fed.Cir.1994), *reh'g and reh'g en banc denied*, 141 F.3d 1112 (Fed.Cir.), *cert. denied*, 525 U.S. 932, 119 S.Ct. 342, 142 L.Ed.2d 282 (1998); *see also Gluck v. United States*, 84 Fed.Cl. 609, 613 (2008). "[S]ection 7422(a) creates a jurisdictional prerequisite to filing a refund suit." *Id.* (citing *Chicago Milwaukee Corp. v. United States*, 40 F.3d at 374 (citing *Burlington N., Inc. v. United States*, 231 Ct.Cl. 222, 684 F.2d 866, 868 (1982))). Once a party has established compliance with 26 U.S.C. § 7422(a), the party may, if successful, also recover interest for its refund claim. *See Deutsche Bank AG v. United States*, 95 Fed.Cl. 423, 427 n. 3 (2010) (citing *Brown & Williamson, Ltd. v. United States*, 231 Ct.Cl. 413, 688 F.2d 747, 752 (1982)) ("There is no question, however, that this court has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2006), over claims, such as the present one, seeking to recover statutory interest on income tax refunds.").

　　█ Furthermore, as noted above, in order for a tax refund case to be duly filed in a federal court pursuant to Section 7422(a), the filing must comply with the timing requirements set forth in 26 U.S.C. § 6511(a):

The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied. When

waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.

*Block v. North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *see also Buser v. United States*, 85 Fed.Cl. at 257. The applicable language of Section 6511(a) states:

Claim for credit or refund of an overpayment of any tax imposed by this title . . . shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid . . . .

26 U.S.C. § 6511(a); *see also* Treas. Reg. § 301.6511(a)–1 (2012) ("In the case of any tax . . . : If a return is filed, a claim for credit or refund of an overpayment must be filed by the taxpayer within 3 years from the time the return was filed or within 2 years from the time the tax was paid, whichever of such periods expires the later."). As articulated by the United States Supreme Court in *Commissioner v. Lundy*, 516 U.S. 235, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996):

A taxpayer seeking a refund of overpaid taxes ordinarily must file a timely claim for a refund with the IRS under 26 U.S.C. § 6511. That section contains two separate provisions for determining the timeliness of a refund claim. It first establishes a filing deadline: The taxpayer must file a claim for a refund "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." 26 U.S.C. § 6511(b)(1) (incorporating by reference 26 U.S.C. § 6511(a)). It also defines two "look-back" periods: If the claim is filed "within 3 years from the time the return was filed," *ibid.*, then the taxpayer is entitled to a refund of "the portion of the tax paid within the 3 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(A) (incorporating by

reference 26 U.S.C. § 6511(a)). If the claim is not filed within that 3–year period, then the taxpayer is entitled to a refund of only that "portion of the tax paid during the 2 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(B) (incorporating by reference § 6511(a)).

*Comm'r v. Lundy,* 516 U.S. at 239–40, 116 S.Ct. 647 (footnote omitted); *see also United States v. Clintwood Elkhorn Mining Co.,* 553 U.S. at 8, 128 S.Ct. 1511 (determining that the language of section 6511(a) clearly states that taxpayers "must comply with the Code's refund scheme before bringing suit, including the requirement to file a timely administrative claim."). The Supreme Court in *Lundy* also noted that a timely filing was a prerequisite for the Court of Federal Claims to have jurisdiction for a refund claim. *Comm'r v. Lundy,* 516 U.S. at 240, 116 S.Ct. 647 ("Unlike the provisions governing refund suits in United States District Court or the United States Court of Federal Claims, which make timely filing of a refund claim a jurisdictional prerequisite to bringing suit, *see* 26 U.S.C. § 7422(a); *Martin v. United States,* 833 F.2d 655, 658–659 (7th Cir.1987), the restrictions governing the Tax Court's authority to award a refund of overpaid taxes incorporate only the look-back period and not the filing deadline from § 6511.").

In sum, Congress has provided strict statutory guidelines laying out the statute of limitations for the filing of a federal tax refund claim:

> Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been "erroneously," "illegally," or "wrongfully collected," §§ 1346(a)(1), 7422(a), may not be maintained in any court.

*United States v. Dalm,* 494 U.S. at 602, 110 S.Ct. 1361.

██ In the above captioned case, plaintiffs have satisfied all of the prerequisites for filing a timely tax refund claim in the United States Court of Federal Claims. On January 26, 1999, the Co–Executors of Mr. Smith's Estate timely filed the Estate's Form 706. On January 25, 2002, the Estate timely filed a claim for refund, and on that same date the IRS issued a Notice of Deficiency. On March 1, 2002, the Estate paid the full amount of the outstanding tax and interest, including the deficiency, asserted against it. On September 13, 2002, the Estate timely filed a second claim for refund. The IRS issued a Notice of Claim Disallowance on March 23, 2005. The Estate then filed a third claim for refund on February 23, 2007, which was disallowed on February 28, 2007. On September 19, 2007, plaintiffs filed suit in this court.

Plaintiffs seek a refund of taxes paid based on the value of the 12,424 shares of Class B shares included in Mr. Smith's taxable Estate, and argue that the taxes collected by the IRS were erroneously assessed and collected. Generally, 26 U.S.C. § 2001(a) (2006) imposes a tax on the transfer of the taxable estate of every decedent who is a citizen of the United States. The provisions of 26 U.S.C. § 2033 (2006) include in the estate the value of all property of a decedent at the time of death. In the case currently before the court, plaintiffs assert that 26 U.S.C. § 2704 does not apply to determining the value of stock shares in Mr. Smith's Estate. Defendant, however, argues that 26 U.S.C. § 2704 does apply, leading to a higher fair market value of the decedent's shares, and consequently higher estate tax due. Jurisdiction in this court is not contested.

*Summary Judgment*

██ Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar, both in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2011); Fed.R.Civ.P. 56(a) (2011); *see also Alabama v. North Carolina,* —— U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123

L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2010); *Consol. Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States*, 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1378 (Fed.Cir.2009); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied*, 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir. 2005); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1370–71 (Fed. Cir.), *reh'g en banc denied* (Fed.Cir. 2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Cohen v. United States*, 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States*, 99 Fed.Cl. 607, 610 (2011). A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Thompson v. United States*, 101 Fed.Cl. 416, 425–26 (2011); *Cohen v. United States*, 100 Fed.Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Walker v. United States*, 79 Fed.Cl. 685, 692 (2008); *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. at 249, 106 S.Ct. 2505; *see, e.g., Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Cohen v. United States*, 100 Fed.Cl. at 469–70; *Boensel v. United States*, 99 Fed.Cl. at 611; *Macy Elevator, Inc. v. United States*, 97 Fed.Cl. 708, 717 (2011); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States*, 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed. Cir.2002), *published at* 317 F.3d 1331 (Fed. Cir.2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1316 (Fed.Cir.2001); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (quoting *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacat-*

ed on other grounds, 970 F.2d 890 (Fed.Cir. 1992) (citation omitted); see also Metric Constr. Co., Inc. v. United States, 73 Fed.Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S.Ct. 2505; see also Takeda Pharm. Co. v. Doll, 561 F.3d 1372, 1375 (Fed.Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed.Cir.), reh'g and reh'g en banc denied (Fed.Cir. 2007), cert. denied, 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed.Cir.1999); Gonzales–McCaulley Inv. Group, Inc. v. United States, 101 Fed.Cl. 623, 628–29 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88, 106 S.Ct. 1348; Yant v. United States, 588 F.3d 1369, 1371 (Fed.Cir.2009), cert. denied, —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed.Cir.2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed.Cir. 2002), cert. denied, 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed.Cir.), reh'g denied and en banc suggestion declined (Fed.Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok–Lok, Ltd., 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); Boensel v. United States, 99 Fed.Cl. at 611 (" 'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S.Ct. 2505) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88, 106 S.Ct. 1348, Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283, Lathan Co. Inc. v. United States, 20 Cl.Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed.Cir.2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed.Cir.2005); Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed.Cir.), reh'g denied (Fed.Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.1997) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed.Cir.1994), reh'g denied and en banc suggestion declined (Fed.Cir. 1995)), reh'g denied and en banc suggestion declined (Fed.Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed.Cir.1997); Dana R. Hodges Trust v. United States, 101 Fed.Cl. 549, 553–54 (2011). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322, 106 S.Ct. 2548; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir.2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Florida

*Power & Light Co. v. United States,* 375 F.3d 1119, 1124 (Fed.Cir.2004); *Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001); *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States,* 434 F.3d 1359, 1369 (Fed.Cir.2006).

◼ Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Marriott Int'l Resorts, L.P. v. United States,* 586 F.3d 962, 968–69 (Fed.Cir.2009); *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *Rogers v. United States,* 90 Fed.Cl. 418, 427 (2009); *Consol. Coal Co. v. United States,* 86 Fed.Cl. 384, 387 (2009), *aff'd,* 615 F.3d 1378 (Fed.Cir.2010); *St. Christopher Assocs., L.P. v. United States,* 75 Fed.Cl. 1, 8 (2006), *aff'd,* 511 F.3d 1376 (Fed. Cir.2008); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or otherwise stated, in favor of the non-moving party. *See First Commerce Corp. v. United States,* 335 F.3d 1373, 1379 (2003); *see also DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed. Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Oswalt v. United States,* 85 Fed.Cl. 153, 158 (2008); *Telenor Satellite Servs., Inc. v. United States,* 71 Fed.Cl. 114, 119 (2006). "Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); *see also Manor Care, Inc. v. United States,* 89 Fed.Cl. at 622 ("Cases such as the one presented here, which involve competing interpretations of a statute, are particularly well-suited for adjudication by summary judgment." (citing *Santa Fe Pac. R.R. Co. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir.2002))).

In this case, the parties have cross-moved for partial summary judgment on the issue of whether or not 26 U.S.C. § 2704 applies to the Class A shares of common stock which were automatically converted on Mr. Smith's death to Class B shares, as part of his Estate. As noted above, if Section 2704 applies and requires valuation as Class A shares, with their enhanced voting rights, Mr. Smith's Estate would possess a higher value for estate tax purposes. If Section 2704 does not apply, the Estate would have a lower value for estate tax purposes. The issue currently before the court, on which the parties agree, is a matter of statutory interpretation of Tax Code provisions, and partial summary judgment is appropriate. *See Gonzales v. United States,* 48 Fed.Cl. 176, 178 (2000) ("Because the parties agree that the issue presently before the court is exclusively a matter of statutory interpretation, sum-

mary judgment is appropriate in this case." (citing *Nissho Iwai Am. Corp. v. United States*, 143 F.3d 1470, 1472 (Fed.Cir.1998))), *aff'd*, 275 F.3d 1340 (Fed.Cir.2001).

*Treatment of Certain Lapsing Rights and Restrictions pursuant to 26 U.S.C. § 2704*

■ The statute codified at 26 U.S.C. § 2704 was enacted on November 5, 1990, by Section 11602(a) of Public Law 101–508, the Omnibus Budget Reconciliation Act of 1990. Section 11602(e) of the Omnibus Budget Reconciliation Act provided that Section 2704 applies to restrictions or limitations on rights created after October 8, 1990. Pursuant to Treasury Regulation § 25.2704–1 (1997), if a corporation is controlled by a family, then the lapse of a voting right is deemed to be a transfer by the holder of the voting right to the holder's family. If the transfer of the voting right occurs during the holder's lifetime (which is the plaintiffs' contention), the lapse of the voting right is a transfer by gift. If the transfer of the voting right occurs at the holder's death (which is the defendant's contention), the lapse is a transfer included in the holder's estate.

26 U.S.C. § 2704 addresses the lapsing of voting rights:

**(a) Treatment of lapsed voting or liquidation [8] rights.—**

(1) **In general.**—For purposes of this subtitle, if—

(A) there is a lapse of any voting or liquidation right in a corporation or partnership, and

(B) the individual holding such right immediately before the lapse and members of such individual's family hold, both before and after the lapse, control of the entity, such lapse shall be treated as a transfer by such individual by gift, or a transfer which is includible in the gross estate of the decedent, whichever is applicable, in the amount determined under paragraph (2).

(2) **Amount of transfer.**—For purposes of paragraph (1), the amount determined

under this paragraph is the excess (if any) of—

(A) the value of all interests in the entity held by the individual described in paragraph (1) immediately before the lapse (determined as if the voting and liquidation rights were nonlapsing), over

(B) the value of such interests immediately after the lapse.

26 U.S.C. § 2704.

The Treasury Regulation at 26 C.F.R. § 25.2704–1, titled, "Lapse of certain rights," provides:

(a) **Lapse treated as transfer—(1) In general.** The lapse of a voting right or liquidation right in a corporation or partnership (an "entity") is a transfer by the individual directly or indirectly holding the right immediately prior to its lapse (the "holder") to the extent provided in paragraphs (b) and (c) of this section. This section applies only if the entity is controlled by the holder and members of the holder's family immediately before and after the lapse. The amount of the transfer is determined under paragraph (d) of this section. If the lapse of a voting right or a liquidation right occurs during the holder's lifetime, the lapse is a transfer by gift. If the lapse occurs at the holder's death, the lapse is a transfer includible in the holder's gross estate.

· · ·

(b) **Lapse of voting right.** A lapse of a voting right occurs at the time a presently exercisable voting right is restricted or eliminated.

· · ·

(d) **Amount of transfer.** The amount of the transfer is the excess, if any, of—

(1) The value of all interests in the entity owned by the holder immediately before the lapse (determined immediately after the lapse as if the lapsed right was nonlapsing); over

(2) The value of the interests described in the preceding paragraph immediately

---

**8.** The language of 26 U.S.C. § 2704 and Treasury Regulation § 25.2704–1 address both voting rights and liquidation rights. Both parties agree that only voting rights are at issue under the facts of this case.

after the lapse (determined as if all such interests were held by one individual). Treas. Reg. § 25.2704–1(a), (b), (d).[9]

The key pertinent terms are defined as follows: "In the case of a corporation, the term 'control' means the holding of at least 50 percent (by vote or value) of the stock of the corporation." 26 U.S.C. § 2701(b)(2)(A) (2006); *see also* Treas. Reg. § 25.2701–2(b)(5)(ii)(A) (2012) ("In the case of a corporation, control means the holding of at least 50 percent of the total voting power or total fair market value of the equity interests in the corporation."); *see also* Treas. Reg. § 25.2704–1(a)(2)(i) (indicating that "control" has the meaning stated in Treas. Reg. § 25.2701–2(b)(5)).

"Lapse of voting right," occurs "at the time a presently exercisable voting right is restricted or eliminated." Treas. Reg. § 25.2704–1(b). "Voting right" is defined by the Treasury Regulations as "a right to vote with respect to any matter of the entity." Treas. Reg. § 25.2704–1(a)(2)(iv); *see also* Treas. Reg. § 25.2701–2(b)(5)(ii)(B) ("Generally, a voting right is considered held by an individual to the extent that the individual, either alone or in conjunction with any other person, is entitled to exercise (or direct the exercise of) the right.").

"[V]alue" of the transfer for estate tax purposes, in the statute, is the value of the interest owned by the holder immediately before the lapse, determined as if the lapsed voting right was nonlapsing, over the value of the voting right immediately after the lapse. *See* 26 U.S.C. § 2704(a)(2).

*Statutory Construction*

The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *see also Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d at 1323 ("When interpreting any statute, we look first to the statutory language."). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. at 341, 117 S.Ct. 843 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) and *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)). " 'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.' " *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed.Cir.) (quoting *Bull v. United States*, 479 F.3d 1365, 1376 (Fed.Cir.2007)), *reh'g en banc denied* (Fed.Cir. 2010).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty,

---

9. The statute, 26 U.S.C. § 2704(a)(2)(A), therefore, determines the amount of transfer by the value of the interests immediately before the lapse as if the rights were nonlapsing, over the value of the interests immediately after the lapse, and Treasury Regulation § 25.2704–1(d) determines the amount of transfer by the value of the interests immediately after the lapse as if the rights were nonlapsing, over the value of the interests immediately after the lapse. Using the formula for value in 26 U.S.C. § 2704, which measures the value of the voting rights immediately before the lapse, determined as if the voting rights were nonlapsing, over the value of the voting rights immediately after the lapse, the parties have stipulated that the first value is $30,000,000.00, and the second value is $22,500,000.00. The parties have not identified, and the record does not reflect, any element, such as decedent's management influence or other factor, which would reduce the value of decedent's Class A shares such that their nonlapsing value immediately before the lapse would have been different from their nonlapsing value immediately after the lapse. *See e.g.,* Treas. Reg. § 25.2704–1(f), ex. 1.

if possible, to give meaning to every clause and word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) ("It is, moreover, ' "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant." ' " (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)))); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2000).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941; *see also Arko Foods Int'l, Inc. v. United States,* 654 F.3d 1361, 1364 (Fed.Cir. 2011) (" '[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.' " (quoting *Millenium Lumber Distrib., Ltd. v. United States,* 558 F.3d 1326, 1328 (Fed.Cir.2009), *reh'g denied,* 558 F.3d 1326 (2009)); *Am. Airlines, Inc. v. United States,* 551 F.3d 1294, 1300 (Fed.Cir.2008), *reh'g granted,* 319 Fed.Appx. 914 (Fed.Cir. 2009). Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron ·Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290

(1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))); *see also Bartels Trust for the Benefit of Cornell Univ. ex. rel. Bartels v. United States,* 617 F.3d at 1361 (citing *Sharp v. United States,* 580 F.3d 1234, 1237 (Fed.Cir. 2009), *Jimenez v. Quarterman,* 555 U.S. at 118, 129 S.Ct. 681, and *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed. Cir.) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379, *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993))), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] princip[e]l gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Indeed, in construing a statute courts " 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.' " *Schindler Elevator Corp. v. United States,* — U.S. —, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011) (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009)) (internal quotation marks omitted). Even " '[w]hen terms used in a statute are undefined, we give them their ordinary meaning.' " *Schindler Elevator Corp. v. United States,* 131 S.Ct. at 1891 (quoting

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States*, 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."), *reh'g denied sub nom. Hall v. United States*, 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005); *but see Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed.Cir.2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States*, 510 U.S. 135, 147–48 [114 S.Ct. 655, 126 L.Ed.2d 615] (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting *Tidewater Oil Co. v. United States*, 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972))), *cert. denied*, 544 U.S. 923, 125 S.Ct. 1669, 161 L.Ed.2d 481 (2005).

Legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Bruesewitz v. Wyeth LLC*, —— U.S. ——, 131 S.Ct. 1068, 1081–82, 179 L.Ed.2d 1 (2011) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005)); *see also Xianli Zhang v. United States*, 640 F.3d 1358, 1373 (Fed.Cir.2011), *petition for cert. filed* (U.S. Jan. 9, 2012). However, legislative history does not "trump[ ] clear text." *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d at 1361 (citing *Sharp v. United States*, 580 F.3d at 1238, *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 396 (Fed.Cir.1990), and *Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed.Cir.2006)).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932)); *see also Bulova Watch Co. v. United States*, 365 U.S. 753, 761, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961)). A more specific statute will not be superseded by a more recent, general statute unless there is a clear indication of the intent to do so. *See Morton v. Mancari*, 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (holding specific controlling over general, irrespective of priority of enactment). Therefore, for a subsequently enacted statute to be held controlling, the circumstances must explicitly indicate the congressional intent to do so. *See United States v. United Cont'l Tuna*, 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) (holding that "... repeals by implication are not favored."). The principle is particularly applicable in situations in which a party seeks to have a specific statute superseded by a more general one. *See Southwest Marine of San Francisco, Inc. v. United States*, 896 F.2d 532, 533 (Fed.Cir.1990). The view of a later Congress on a statute, however, does not control how to interpret an earlier enacted statute, *see O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996), although subsequent legislation "does have persuasive value," *Bell v. New Jersey*, 461 U.S. 773, 784, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), and "is entitled to great weight in statutory construction," *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnote omitted); *see also Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004). The Supreme Court also has written that "administrative

implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 129 S.Ct. 2710, 2715, 174 L.Ed.2d 464 (2009) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778) ("Under the familiar *Chevron* framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering."); *Yanco v. United States*, 258 F.3d 1356, 1362 (Fed.Cir.2001).

Elaborating on the *Chevron* doctrine, the United States Supreme Court in *Mead* stated:

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," *Chevron*, 467 U.S., at 843–844 [104 S.Ct. 2778], and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. *See id.*, at 844 [104 S.Ct. 2778]; *United States v. Morton*, 467 U.S. 822, 834 [104 S.Ct. 2769, 81 L.Ed.2d 680] (1984); APA, 5 U.S.C. §§ 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,' " *Bragdon v. Abbott*, 524 U.S. 624, 642 [118 S.Ct. 2196, 141 L.Ed.2d 540] (1998) (quoting *Skidmore*, 323 U.S., at 139–140 [65 S.Ct. 161]), and "[w]e have long recognized that considerable weight should be accorded to

an executive department's construction of a statutory scheme it is entrusted to administer. . . ." *Chevron, supra*, at 844 [104 S.Ct. 2778] (footnote omitted); see also *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 [100 S.Ct. 790, 63 L.Ed.2d 22] (1980); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 [98 S.Ct. 2441, 57 L.Ed.2d 337] (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see *Skidmore, supra*, at 139–140 [65 S.Ct. 161].

*United States v. Mead Corp.*, 533 U.S. at 227–28, 121 S.Ct. 2164 (omissions in original and footnotes omitted); *see also Household Credit Servs., Inc. v. Pfennig*, 541 U.S. at 239, 242, 124 S.Ct. 1741; *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed.Cir.2006), *cert. denied*, 549 U.S. 1205, 127 S.Ct. 1246, 167 L.Ed.2d 74 (2007); *Cal. Indus. Prods., Inc. v. United States*, 436 F.3d 1341, 1352–57 (Fed. Cir.2006); *Rotech Healthcare Inc. v. United States*, 71 Fed.Cl. 393, 421, *appeal dismissed*, 214 Fed.Appx. 973 (Fed.Cir.2006). Moreover, explaining the relevance and purpose of *Chevron* deference, the Supreme Court has noted:

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (internal citations omitted).

*Chevron* deference requires that a court ask the following questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted); *see also Judulang v. Holder*, —— U.S. ——, 132 S.Ct. 476, 484 n. 7, 181 L.Ed.2d 449 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is ' "arbitrary or capricious in substance." ' " (quoting *Mayo Found. for Med. Ed. and Research v. United States*, —— U.S. ——, 131 S.Ct. 704, 711, 178 L.Ed.2d 588 (2011) (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. at 242, 124 S.Ct. 1741))). "[I]f Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 866, 104 S.Ct. 2778) (other citations omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Chevron U.S.A., Inc. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

The United States Supreme Court has stated for "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.' " *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)). The Supreme Court has applied this normal rule of statutory construction to the Internal Revenue Code. *See Sorenson v. Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986).

The United States Supreme Court also has indicated that regulations issued by the IRS are accorded *Chevron* deference if consistent with the relevant statute. "Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' " *Comm'r v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981) (quoting *Comm'r v. South*

*Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948)). The Supreme Court elaborated that courts "must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.'" *Comm'r v. Portland Cement Co.,* 450 U.S. at 169, 101 S.Ct. 1037 (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967)). The Supreme Court noted that "[w]e do this because Congress has delegated to the [Commissioner], not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code," *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 219, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *Nat'l Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979)), and because the Supreme Court does not "'sit as a committee of revision to perfect the administration of the tax laws.'" *United States v. Cleveland Indians Baseball Co.,* 532 U.S. at 218, 121 S.Ct. 1433 (quoting *United States v. Correll,* 389 U.S. at 306–307, 88 S.Ct. 445); *see also Keener v. United States,* 551 F.3d 1358, 1363 (Fed.Cir.) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843, 104 S.Ct. 2778) ("Since the statute is ambiguous with respect to this issue, we give deference to the agency's interpretation of the statute."), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* — U.S. ——, 130 S.Ct. 153, 175 L.Ed.2d 38 (2009); *Khan v. United States,* 548 F.3d 549, 554 (7th Cir.2008) ("We review general authority tax regulations under the criteria articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).").

The Federal Circuit likewise has indicated that: "'Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" *CUNA Mut. Life Ins. Co. v. United States,* 169 F.3d 737, 742 (Fed.Cir.1999) (quoting *Am. Mut. Life Ins. Co. v. United States,* 43 F.3d 1172, 1176 (8th Cir.1994)); *see also Dow Corning Corp. v. United States,* 984 F.2d 416, 419 (Fed.Cir. 1993); *Dillon, Read & Co., Inc. v. United States,* 875 F.2d 293, 299 (Fed.Cir.1989) (citing *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982)) (Treasury Regulations "are to be sustained unless disharmonious with the controlling statute...."). "'Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a).'" *Colt Indus., Inc. v. United States,* 880 F.2d 1311, 1314 (Fed.Cir.1989) (quoting *United States v. Correll,* 389 U.S. at 307, 88 S.Ct. 445 (quoting 26 U.S.C. § 7805(a))); *see also Murfam Farms, LLC v. United States,* 88 Fed.Cl. 516, 522 (2009) ("Section 7805(a) of the Code authorizes the Secretary of the Treasury to promulgate rules and regulations in connection with the enforcement of the Code.") (internal citation omitted), *motion to vacate denied* (2010).

*Family Control of the Company*

■ When there is a lapse of a voting right in a corporation through restrictions on, or the elimination of, the voting right, the lapse will be treated as a transfer subject to the estate tax, "only if the entity is controlled by the holder [of the voting right] and members of the holder's family immediately before and after the lapse." Treas. Reg. § 25.2704–1(a); *see also* 26 U.S.C. § 2704(a)(1)(B) ("[T]he individual holding such right immediately before the lapse and members of such individual's family hold, both before and after the lapse, control of the entity...."). The definition of "control" also is provided: "In the case of a corporation, the term 'control' means the holding of at least 50 percent (by vote or value) of the stock of the corporation." 26 U.S.C. § 2701(b)(2)(A); *see also* Treas. Reg. § 25.2701–2(b)(5)(ii)(A) (Family control of the corporation, before and after the lapse of the voting right, is defined as "the holding of at least 50 percent of the total voting power or total fair market value of the equity interests in the corporation."); Treas. Reg. § 25.2704–1(a)(2)(i) (indicating that for purpose of Treas. Reg. § 25.2704–1, the Treasury Regulation at issue, the term "control" has the meaning stated in the above quoted Treas. Reg. § 25.2701–2(b)(5)).

Before his death, according to defendant, Mr. Smith and members of his family held

over 90% of the corporate vote and 88% of the equity of the corporation while plaintiffs suggest that before his death Mr. Smith and his family members held 97.47% of the votes. As discussed below, the apparent discrepancy in numbers, however, does not alter the result in this case. Moreover, both plaintiffs and defendant agree that after Mr. Smith's death, his family held 88% of the votes and 88% of the market value. Voting power is defined by both the Tax Code and the Treasury Regulations in terms of either voting power *or* market value. The significant percentage of family voting power and the significant percentage of equity holdings, which percentages have not been disputed by plaintiffs, meet the "at least 50 percent" of the voting power or the market value tests, in 26 U.S.C. § 2701(b)(2)(A) and the implementing regulations.

Plaintiffs, however, argue that "control" requires more than just 50% of the votes or 50% of the market value, and that Mr. Smith and his family did not have control of the corporation. According to plaintiffs, "control" requires that the family not only hold at least 50% of the voting rights, but the family also must have been entitled to exercise the right to restore the voting right that had lapsed when Mr. Smith died. In the plaintiffs' words:

> As a result of the 1991 transaction with John Imlay and Tom Brown (the "Imlay–Brown Transaction"), the Smith family did not possess the control necessary to restore the Class A shares' disproportionate voting rights after Mr. Smith's death and, consequently, could not recover or benefit from any lost value associated with those rights. The Smith family therefore did not have the "control" required by § 2704(a)(1).
>
> . . .
>
> Thus, both before and after Mr. Smith's death, members of the Smith family, notwithstanding that they possessed 97.47% of the Company's total vote with respect to certain matters before Mr. Smith's death and 88% of the Company's total vote after Mr. Smith's death, could not amend the governing corporate documents to restore to Mr. Smith's Estate the disproportionate

voting rights of the Class A shares. (footnotes and citations omitted).

Plaintiffs argue that their interpretation of the statutory and regulatory definition of control of a corporation is founded in the legislative history of 26 U.S.C. § 2704, which explicitly reflected the intent to overcome the United States Tax Court's ruling in the United States Tax Court case of *Estate of Harrison v. Commissioner*, 52 T.C.M. (CCH) 1306 (1987). *See* Informal Senate Report on S. 3209, 136 Cong. Rec. S15683 (1990) ("These rules are intended to overturn the result and reasoning of *Harrison v. Commissioner*."); *see also* House–Senate Conference Committee Report, H.R.Rep. No. 101–964 at 1137 (1990) ("These rules are intended to prevent results similar to that of *Estate of Harrison v. Commissioner* 52 T.C.M. (CCH) 1306 (1987).").

In *Estate of Harrison*, 52 T.C.M. (CCH) at 1307, upon Mr. Harrison's death, his two sons exercised an option to purchase Mr. Harrison's general partnership interest. *Id.* The IRS valued Mr. Harrison's estate at $59,555,020.00 for estate tax purposes, the agreed upon value Mr. Harrison would have received for his limited partnership interest if it had been terminated prior to Mr. Harrison's death. *Id.* at 1308. The two sons valued Mr. Harrison's estate at $33,000,000.00, because it did not contain the liquidation right, or right to dissolve the partnership, associated with his general partnership interest during his lifetime. *Id.* The partnership agreement provided that the remaining general partners only had the option to purchase a deceased's general partnership interest. *Id.* at 1307.

The government argued in *Estate of Harrison*, that the Tax Court "should ignore the effect the partnership agreement has upon decedent's limited partnership interest because the partnership agreement was an attempt to artificially depress the value of decedent's property for estate tax purposes." *Id.* at 1309. The Tax Court declined to adopt this theory, concluding instead that, "although the creation of the partnership eventually resulted in a substantial decrease in estate taxes, there is no proof in the record that the partnership was created other than

for business purposes," and that Mr. Harrison's sons "presented convincing proof that the partnership was created as a means of providing necessary and proper management of decedent's properties and that the partnership was advantageous to and in the best interests of decedent." *Id.*

The Tax Court in *Estate of Harrison* determined that the fair market value of Mr. Harrison's estate, at the time of death, was $33,000,000.00, because only his limited partnership interest, without the liquidation right, passed to his estate. *Id.* at 1308–10. The Tax Court observed that: "The difference between the two values [of Mr. Harrison's estate, $59,555,020.00 versus $33,000,000.00] is attributable entirely to the right which decedent had as a general partner up until his death to force a dissolution of the partnership." *Id.* at 1308.

The United States Tax Court observed that the liquidation right, which enhanced the value of the limited partnership interest, was not part of Mr. Harrison's estate, which resulted in a smaller estate, for estate tax computation purposes. *See id.* at 1308–10. As stated by the Tax Court, "[t]he value [of decedent's estate] is to be determined by reference to the classical fair market value.... Thus, decedent's right during life to liquidate the partnership would no longer be available to enhance the value of the partnership interest after his death." *Id.* at 1309.

Plaintiffs argue that:

As the legislative history demonstrates, section 2704 was intended to reverse the result in *Estate of Harrison.* In *Estate of Harrison,* the decedent's liquidation right with respect to his family partnership interest was not included in his estate because it was eliminated upon his death. However, the decedent's two sons had complete control of the family partnership following decedent's death and therefore had the requisite control to restore the lapsed liquidation right. Thus, under section 2704(a)(1), Congress provided for a tax on an economic transfer resulting where a voting or liquidation right in a corporation or partnership held by an individual lapses, and such individual and members of the individual's family *control* the entity both before and after the lapse.

"Control" as contemplated by Congress in section 2704 means family control, both before and after the lapse that is sufficient to create and restore the lapsed right. This is precisely the type of family control evidenced in *Estate of Harrison.* Further, the relevant Treasury Regulation states that *"[i]n general ... control* means the holding of at least 50 percent of the total voting power or total fair market value of the equity interests in the corporation." Treas. Reg. section 25.2701–2(b)(5)(ii) (emphasis added). Thus, "the general" proviso plainly recognizes that merely holding more than 50% of the vote or the equity will not in all cases provide sufficient control for family shareholders to restore a lapsed voting or liquidation right.

Here, in stark contrast to *Estate of Harrison,* the Smith family simply did not possess sufficient control to undo the restrictions on the voting rights created in 1991 without the consent of Messrs. Imlay and Brown, two businessmen with economic interests in maintaining those restrictions. Consequently, once the Smith family entered into the Imlay–Brown Transaction, at no time thereafter, either before or after Mr. Smith's death, could they remove the restrictions on the disproportionate voting rights, notwithstanding that the family had a majority vote. Because the Smith family did not possess sufficient control at any time after the Imlay–Brown Transaction to reverse the restrictions on the disproportionate voting rights, the requisite level of family control for section 2704 to apply did not exist. For this reason as well, section 2704 does not apply in this case.

Defendant, however, argues that in *Estate of Harrison,* the reduction of the value of the decedent's interest in a family-controlled business, because of the lapse of a liquidation right upon his death, was the result and reasoning Congress sought to overturn by adopting 26 U.S.C. § 2704. According to defendant, in the case of *Rankin–Smith:*

Plaintiff [sic] argues that § 2704 does not apply here because the lapse restriction

was created before the effective date of that section. (P. Memorandum at 11–12) Treas. Reg. § 25.2704–3 provides that § 2704 applies to lapse provisions created after October 8, 1990. Plaintiff [sic] contends that the lapse at issue in this case was created by the 1986 shareholders agreements, before October 8, 1990, and, therefore, § 2704 does not apply here. Plaintiff [sic] contends that the 1991 amendment to the corporation's by-laws merely carried forward the restrictions in the 1986 agreement.... Plaintiff [sic] focuses only on the restriction in the 1986 agreement on the ability of the decedent to sell his stock. The lapse at issue here occurred upon death, when the decedent's stock converted from Class A stock to Class B stock. While the 1991 provision provided that the decedent's stock would convert from Class A to Class B upon a sale, that provision is not relevant here because no sale occurred and the decedent never intended to sell his stock. Plaintiff [sic] focuses on the restrictions on sale because the 1996 agreement did not restrict the right of the decedent to bequeath his Class A stock, as Class A stock, to any member of his family. The 1986 agreement, therefore, contained no provision that the voting rights associated with the decedent's Class A stock would lapse upon his death. Therefore, the lapse restriction at issue in this case, the conversion of the decedent's Class A stock to Class B stock upon his death, clearly was created by the March 25, 1991 amendment to the by-laws. Section 2704 applies to this case.

The "Informal Senate Report" with respect to 26 U.S.C. § 2704 states that Congress was "concerned about the use of lapsing rights to transfer value free of transfer tax.... [P]roperty transferred at death is more accurately valued by disregarding lapsing restrictions and by adding back the value attributable to a lapsing right to the value of the transferor's interest in the business." 136 Cong. Rec. S15681, at 155 (1990). The "Informal Senate Report" continues: "any right held by the decedent with respect to property includible in the gross estate which effectively lapsed on the death of the decedent would, in valuing such property in the estate, be deemed exercisable by the estate." 136 Cong. Rec. S15683, at 157–58 (1990). The "Informal Senate Report" also includes an illustrative example (Example 8):

> Parent and child form a corporation in which the parent obtains voting common stock and the child obtains nonvoting common stock. The voting feature of the parent's stock lapses on the parent's death. Under the bill, [section 2704] the parent's stock is valued under the assumption that the stock continues to vote.

*Id.* at ex. 8.

The House–Senate Conference Report on Section 2704 provided an example (Example 6) similar [10] to the example in the "Informal Senate Report", cited above: "Parent and Child control a corporation. Parent's stock has a voting right that lapses on Parent's death. Under the conference agreement, Parent's stock is valued for Federal estate tax purposes as if the voting right of the parent's stock were nonlapsing." H.R.Rep. No. 101–964 at 1137, ex. 6 (1990). The legislative history, therefore, reflects a desire on the part of Congress to ensure that, in a family controlled corporation, the lapse of a voting right resulting from the death of the holder of the right should be disregarded for purposes of estate tax valuation.

Moreover, the valuation of a voting right issue in the case before this court was not addressed in *Estate of Harrison*, which addressed a liquidation voting right. Liquidation rights and voting rights are different. "Liquidation right means a right or ability to compel the entity to acquire all or a portion

---

**10.** There are differences between Senate Bill S. 3209, which is discussed in the "Informal Senate Report" on S. 3209, and the enacted 26 U.S.C. § 2704. House Bill H.R. 5835, which is discussed in the House–Senate Conference Committee Report on H.R. 5835, was the enacted version of 26 U.S.C. § 2704. When plaintiffs cite to the "Informal Senate Report," the court cites to the Informal Senate Report. The court also cites to the "Informal Senate Report" when there are no substantive differences between the House–Senate Conference Committee Report, as reflected in the examples in the text of this opinion, taken from the legislative history of both the Senate Bill and the House Bill.

of the holder's equity interest in the entity. . . ." Treas. Reg. § 25.2704–1(a)(2)(v). "Voting right means a right to vote with respect to any matter of the entity. . . . The right to compel the entity to acquire all or a portion of the holder's equity interest in the entity by reason of aggregate voting power is treated as a liquidation right and is not treated as a voting right." Treas. Reg. § 25.2704–1(a)(2)(iv). Moreover, neither the Tax Code nor the Treasury Regulations include plaintiffs' understanding of the ruling in *Estate of Harrison* that control is based, not only on 50% of the voting rights or 50% of the market value, but also on the family having the ability to restore lapsed voting rights. As noted above, in the operative statute, Congress stated that "the term 'control' means the holding of at least 50 percent (by vote or value) of the stock of the corporation." 26 U.S.C. § 2701(b)(2)(A). Nor did the implementing Treasury Regulations add plaintiffs' elaboration to the definition of "control." The Treasury Regulations reiterate the definition of control provided by Congress. *See* Treas. Reg. § 25.2701–2(b)(5)(ii)(A) (Family control of the corporation, before and after the lapse of a voting right, is defined as "the holding of at least 50 percent of the total voting power or total fair market value of the equity interests in the corporation."); Treas. Reg. § 25.2704–1(a)(2)(i) (indicating that the term "control" has the meaning stated in the above quoted Treas. Reg. § 25.2701–2(b)(5)). Plaintiffs' reliance on the legislative history of Section 2704 and The case of *Estate of Harrison* does not advance their argument, as compelling as it might be.

Plaintiffs also rely on *Alumax, Inc. v. Commissioner*, 165 F.3d 822 (11th Cir.1999) as another example of a court which "looked beyond a shareholder's numerical voting power to find that a shareholder who owned 80% of a corporation's vote nevertheless lacked the requisite 80% voting power of the corporation's total stock to permit the filing of consolidated returns." In *Alumax* the court considered whether Alumax could be included on the consolidated tax return of one of its shareholders, Amax Inc., and thereby receive tax benefits. *See id.* at 823. In order to have such tax consolidation privi-

leges, 26 U.S.C. §§ 1501 and 1504(a) provided that Amax must have 80% of the voting power in Alumax. *Id.* at 824. The Tax Court determined that Alumax could not file a consolidated return with Amax, Inc. *See Alumax, Inc. v. Comm'r*, 109 T.C. 133, 191 (1997). The Eleventh Circuit interpreted voting power to mean the power to control the corporation's business through the election of the board of directors. *Alumax, Inc. v. Comm'r* 165 F.3d at 825. The Eleventh Circuit's theory was that a single, consolidated tax return could be filed if there was a single business enterprise, which existed "by virtue of common control of business affairs. Thus, the relevant voting power is the power to run the corporation's business—through the board of directors." *Id.* (citations omitted). The appellate court equated the power to elect 80% of the board with the power to operate subsidiary corporations as a common enterprise. *Id.* In *Alumax*, however, the voting authority was diluted by restrictions in the certificate of incorporation. *See id.* at 826. Due to the restrictions, in the court's view, the voting power effectively declined to 50% such that Amax could not be operated as a single enterprise, "notwithstanding Amax's facial power to control 80% of the board votes." *Id.* The Eleventh Circuit affirmed the United States Tax Court's ruling that Alumax was not entitled to file a consolidated return with Amax. *Id.*

The decision in *Alumax* also does not assist plaintiffs in the present case. The court in *Alumax* was operating under a different portion of the Tax Code, for a different purpose, not under 26 U.S.C. § 2704. The Eleventh Circuit believed it was implementing the intent of Congress to ensure that 80% of the voting power meant that a single enterprise (composed of subsidiary corporations, including Alumax) could file a single consolidated tax return. *Id.* The legislative history of 26 U.S.C. § 2704, when trying to reverse the effects of *Estate of Harrison*, was concerned with a different issue, restoring the value of a lapsed right. The Eleventh Circuit in *Alumax* also noted that, "[w]e do not, moreover, have the benefit of on-point Treasury regulations that, if reasonable, would control." *Id.* at 824. In the present case, there are on-

point Treasury Regulations, and those regulations define control pursuant to 26 U.S.C. § 2704 in a straightforward manner. *Alumax* should be read as a ruling based on its own specialized facts and circumstances, including a different section of the Tax Code, with a different operative purpose than that presented in the present case. Moreover, in *Alumax*, due to restrictions, the voting power, effectively, was less than the 80% threshold, where as in the case before the court, the voting power is above the applicable threshold.

■ In sum, plaintiffs urge the court to expand the definition of family control to include not just 50% of the voting power, but also family power to restore a lapsed voting right, an additional element neither Congress nor the Treasury Regulations included in the definition of family control. Plaintiffs also cite to Treasury Regulation § 25.2704–1(c)(2)(i), which states: "Section 2704(a) does not apply to the lapse of a liquidation right to the extent the holder (or the holder's estate) and members of the holder's family cannot immediately after the lapse liquidate an interest that the holder held directly or indirectly *and could have liquidated prior to the lapse.*" Treas. Reg. § 25.2704–1(c)(2)(i)(A) (emphasis in original). Treasury Regulation § 25.2704–1(c)(2)(i) is titled "Lapse of liquidation right." Liquidation rights and voting rights, however, are different matters. As noted above, "[l]iquidation right means a right or ability to compel the entity to acquire all or a portion of the holder's equity interest in the entity. . . ." Treas. Reg. § 25.2704–1(a)(2)(v). "Voting right means a right to vote with respect to any matter of the entity. . . . The right to compel the entity to acquire all or a portion of the holder's equity interest in the entity by reason of aggregate voting power *is treated as a liquidation right and is not treated as a voting right.*" Treas. Reg. § 25.2704–1(a)(2)(iv) (emphasis added). Plaintiffs effectively invite the court to apply the language from the liquidation right regulations to those covering voting rights, without support from applicable statute, regulation or case law.

Congress, at 26 U.S.C. § 2701(b)(2)(A), and the IRS, at Treasury Regulation 25.2701–2(b)(5)(ii)(A), also explicitly define control as owning 50% of the market value, a definition met in this case. Defendant calculates that Mr. Smith and his family held 88% of the market value of the corporation, both before and after Mr. Smith's death, a computation plaintiffs have not disputed, which meets the test for family control of the corporation. In addition, as discussed above, the Rankin Smith family met the 50% voting power test for control of the corporation prescribed by Congress and the Treasury Regulations. *See* 26 U.S.C. § 2701(b)(2)(A); Treas. Reg. § 25.2701–2(b)(5)(ii)(A).

When there is a lapse of a voting right in a corporation through restrictions on or the elimination of the voting right, the lapse will be treated as a transfer subject to the estate tax, "only if the entity [the corporation] is controlled by the holder [of the voting right] and members of the holder's family immediately before and after the lapse." Treas. Reg. § 25.2704–1(a) (brackets added); *see also* 26 U.S.C. § 2704(a)(1)(B) (If there is a lapse of the voting right, and "the individual holding such right immediately before the lapse and members of such individual's family hold, both before and after the lapse, control of the entity," such lapse shall be treated as a transfer by gift, or a transfer to be included in the Estate of the decedent.). For the foregoing reasons, the court finds that Mr. Smith and his family had control of the Company both before and after the lapse of the voting rights for purposes of the application of 26 U.S.C. § 2704.

*Lapse of Voting Rights*

The next issue for consideration is to determine when the lapse of the voting right in this case occurred. The statute, 26 U.S.C. § 2704(a), indicates that the lapse occurs "at the time a presently exercisable voting right is restricted or eliminated." Treas. Reg. § 25.2704–1(b). Under Treasury Regulation § 25.2704–1, the lapse of a voting right in a corporation is a taxable transfer by the holder of the voting right. If the lapse of a voting right occurs during the holder's lifetime, the lapse is a transfer by gift. If the lapse occurs at the time of the holder's death, the lapse is a transfer to be included in the holder's estate. *See* Treas. Reg. § 25.2704–

1(a)(1). Plaintiffs argue that 26 U.S.C. § 2704 does not apply to the facts and circumstances of this case because the lapse of the voting right occurred in 1986, before 26 U.S.C. § 2704 was enacted, in 1990. Alternatively, plaintiffs argue that the lapse of the voting right occurred at the time of the Imlay–Brown Transaction in 1991, which was during Mr. Smith's lifetime, thereby implicating only the gift tax, although also arguing that the gift tax is unwarranted under the facts of the case. Defendant asserts that the lapse of the voting right occurred upon Mr. Smith's death in 1997, thereby implicating the estate tax.

*1986*

Prior to December 31, 1986, the Company was a Subchapter C corporation. The parties have stipulated that the Company had issued 23,750 shares of common stock, which represented 14% of the total votes, and another 152,000 shares of voting preferred stock, which represented the remaining 86% of the total votes. On December 31, 1986, the Company converted from a Subchapter C corporation to a Subchapter S corporation, and preferred shareholders exchanged their preferred stock for newly issued Class A shares with enhanced voting power. The enhanced voting right of the Class A shares preserved the relative voting power that preferred shareholders enjoyed prior to the 1986 conversion to Class A shares. The December 31, 1986, Class A Common Stock Shareholders Agreement also restricted Class A shareholders from selling their Class A shares other than to the Company at the fixed price of $1,176.40 per share, although Mr. Smith could bequeath his Class A shares to his family. A sale to the Company of Mr. Smith's Class A shares (which never occurred in this case), would have eliminated the enhanced voting right of Mr. Smith. Plaintiffs calculate that Mr. Smith could have sold his 12,424 Class A shares to the Company for $14,615,593.60, an assertion not disputed by defendant. The Class A Common Stock Shareholders Agreement also gave the Company the right, at the death of a Class A shareholder, to purchase all of decedent's Class A shares. Either a sale to the Company during the life of the Class A shareholder or redemption by the Company at the death

of the Class A shareholder would have resulted in the elimination of the Class A stock and, thereby, the elimination of the enhanced voting right of the Class A shares. In plaintiffs' words, in 1986, "the Class A shareholders agreed to restrict transfers of the Class A shares for consideration to sales only to the Company during the shareholder's life or redemption of the shares by the Company at the shareholder's death. In either case, this would have resulted in the cancellation of the Class A shares and thus the elimination of their disproportionate voting right."

██ Plaintiffs point out that these 1986 restrictions on Mr. Smith's Class A shares occurred before the 1990 enactment of 26 U.S.C. § 2704, and conclude, therefore, that 26 U.S.C. § 2704 is not applicable to their case. Plaintiffs argue that any lapse occurred in 1986 at the imposition of the 1986 restrictions. Mr. Smith, however, was able to exercise his Class A, enhanced voting right after the 1986 restrictions were imposed, and was able to continue to exercise his enhanced voting right, up to the point of his death, because he never sold his Class A shares. The 1986 Class A Common Stock Shareholders Agreement also permitted Mr. Smith, during his lifetime, to bequeath his Class A shares, complete with their enhanced voting rights, to his family and/or to other Company shareholders by gift, will, trust or intestate succession.

Plaintiffs acknowledge that the 1986 conversion did not place any restriction on Mr. Smith's "presently exercisable voting right," using the language of the Treasury Regulations. *See* Treas. Reg. § 25.2704–1(b) ("A lapse of a voting right occurs at the time a presently exercisable voting right is restricted or eliminated."). Given the unrestricted ability to exercise his enhanced, Class A voting right, until his death, defendant argues that Mr. Smith's enhanced voting right lapsed, that is, was eliminated and unable to be exercised, at Mr. Smith's death, at a time when 26 U.S.C. § 2704 and its estate valuation rules were operative.

*1991*

The restrictions imposed by the 1986 Shareholders Agreement preceded the enact-

ment of 26 U.S.C. § 2704, but Mr. Smith continued to enjoy the unfettered Class A enhanced voting right of his Class A stock up the point of his death. Further restrictions on the enhanced voting right of the Class A shareholder, however, were imposed in 1991, after 26 U.S.C. § 2704 was enacted. Plaintiffs argue that the 1991 Imlay–Brown Transaction merely continued the restrictions on Mr. Smith's ability to transfer the enhanced voting power of his Class A shares, because the 1986 conversion had already restricted Mr. Smith's ability to transfer his Class A enhanced voting power. The restrictions imposed in 1986 and those imposed in 1991, however, are materially different. The 1986 restrictions provided that although he retained his voting rights and control of the shares, Mr. Smith could only sell his Class A shares to the Company, and only at a fixed price of $1,176.40 per share. Alternatively, he could bequeath his Class A shares, with their enhanced voting rights, to his family and/or other co-shareholders by gift, will or intestate succession. Under the 1986 restrictions, Mr. Smith could have bequeathed his Class A shares to his family, but he could not do so following the 1991 restrictions. The 1991 restrictions did not represent a mere change in form, as argued by plaintiffs, but were substantial changes, which occurred after the enactment of 26 U.S.C. § 2704, and which resulted in a lapse of the Class A voting right upon Mr. Smith's death. Following the 1991 restrictions, Mr. Smith's Class A shares were automatically converted to Class B shares upon sale or transfer of any of Mr. Smith's shares to his family during his lifetime, which did not occur until his death in 1997.

Although still maintaining, contrary to defendant's assertions, that 26 U.S.C. § 2704 should not be applied to plaintiffs' case, alternatively, plaintiffs argue that the voting rights of Mr. Smith's Class A shares lapsed on March 27, 1991, with the establishment of the changes to the Company's Articles of Incorporation and Shareholders Agreement resulting from the 1991 Imlay–Brown Transaction. In plaintiffs' words, "the 1991 stock

transaction with John P. Imlay and Tom Watson Brown (the 'Imlay–Brown Transaction') provided, among other things, that upon a sale by Mr. Smith of his Class A shares to a third party purchaser, the disproportionate voting rights of the Class A shares also would be eliminated, since upon such a sale the Class A shares would be converted to Class B shares." No further sale occurred during Mr. Smith's lifetime. Under the 1991 amendment to the Company's Articles of Incorporation, Mr. Smith's death automatically would convert his Class A, enhanced voting right shares into Class B shares, resulting in the elimination of the enhanced voting rights, without an ability to pass on to his family his Class A shares with their enhanced voting rights intact.[11] The lapse restriction which is at issue in the case, and which led to the conversion of Mr. Smith's Class A shares to Class B shares upon his death, was not created by the 1986 amendments, but by the 1991 amendments.

The next issue is whether the actual lapse in the Class A voting right occurred at the time the lapse restriction was imposed, in 1991, as a result of the Imlay–Brown Transaction, or at the time the Class A, enhanced voting right actually was eliminated, in 1997, upon Mr. Smith's death. Although maintaining that 26 U.S.C. § 2704 should not be applied to plaintiffs' case, in the alternative, plaintiffs argue that the lapse occurred in 1991, during Mr. Smith's lifetime, theoretically raising a gift tax responsibility. Plaintiffs, however, did not report any gift in 1991, and paid no gift tax as a result of the Imlay–Brown Transaction. In fact, plaintiffs also argue that no 1991 gift and no gift tax liability came into being because the 1991 Imlay–Brown Transaction, which generated the changes, was an arm's length transaction. Plaintiffs quote Treasury Regulation § 25.2512–8, which provides that the gift tax applies to transfers of property for consideration if the value of the property transferred by the donor exceeds the value of the consideration, "[h]owever, a sale, exchange, or other transfer of property made in the ordinary

---

**11.** Nevertheless, even though after 1991 Mr. Smith no longer could bequeath his Class A stock to his family, the lapse of voting rights at his death (the automatic conversion of Class A shares to Class B shares), ensured that his family had continued voting control over the Company.

course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth." In this regard, defendant notes that Treasury Regulation § 25.2512–8 defers to the gift provisions of 26 U.S.C. § 2704, and states: "See also sections 2701, 2702, 2703 and 2704 and the regulations at §§ 25.2701–0 through 25.2704–3 for special rules for valuing transfers of business interest, transfers in trust, and transfers pursuant to options and purchase agreements." *See* Treas. Reg. § 25.2512–8.

In support of its alternative argument, plaintiffs cite to the language of Treasury Regulation § 25.2704–1(b), which states, "[a] lapse of a voting right occurs *at the time* a presently exercisable voting right is restricted or eliminated." (emphasis added by plaintiffs). Plaintiffs claim, "[i]f the Imlay–Brown Transaction created a new restriction on the Class A shares voting rights, Treasury Regulation section 25.2704–1(b) provides that the Class A shares voting rights lapsed *at that time;* that is, in 1991." (emphasis added by plaintiffs).

Plaintiffs note that the Imlay–Brown Transaction precluded Mr. Smith from selling his enhanced voting rights to a third party purchaser, because any such sale would have caused an automatic conversion of his Class A shares to Class B shares. Plaintiffs state:

> the Imlay–Brown Transaction would have immediately diminished the value of the Class A shares and conferred economic benefit to each Class B shareholder by effectively "locking in" the future voting power of each of the Class B shares. In effect, at the moment the 1991 Agreements were signed, Mr. Smith made a gift to the Class B shareholders on a *pro rata* basis by relinquishing his ability to transfer his preexisting majority voting control of the Company either during his lifetime or at death.

As to the definition of when a lapse in a voting right occurs, plaintiffs suggest that we should look to the point in time of the creation or adoption of restrictions which re-duced the value of the Class A shares. Plaintiffs continue:

> Section 2704 is intended to tax a transfer of economic value effected through a restriction on voting rights at the time the economic transfer occurs. If the economic transfer occurs during the transferor's lifetime, it is taxed as a gift; if it occurs upon the death of the transferor, it is included in his gross estate. Here, the transfer of any economic value associated with the disproportionate voting rights would have occurred in the 1991 Imlay–Brown Transaction which continued the restriction on Mr. Smith's disproportionate voting rights precluding him from selling those rights to a third party purchaser through the automatic conversion of the Class A shares to Class B shares upon any sale. Under section 2704, this transfer of economic value would have constituted a gift made in 1991. This gift would have been taxable only in calendar year 1991, the year of the gift, and these previously transferred rights cannot be pulled back into Mr. Smith's gross estate.

Plaintiffs also state:

> In the context of § 2704, it is the plaintiff's view that a shareholder's presently exercisable voting right encompasses the right of a shareholder to exercise his or her right to vote during his or her lifetime and in addition cause his or her estate (a shareholder's alter ego) to continue to exercise that voting right after his or her death.
>
> . . .
>
> Mr. Smith prior to the Imlay–Brown Transaction could exercise his voting rights during his lifetime when he held his stock and could also direct the exercise of that voting right by his heirs by bequeathing his stock to his Estate. In the context of our case, it is plaintiff's view that a lapse of a voting right can only occur if Mr. Smith's Estate did not succeed to the voting rights of the Class A shares and since voting rights are incident to the ownership of stock, a lapse can only occur if a decedent is unable to bequeath the stock which he or she held immediately prior to his or her demise, to his or her estate—and it was the right of Mr. Smith to bequeath his

Class A shares to his Estate which was restricted in 1991 by the Imlay–Brown Transaction.

Accordingly, it is plaintiff's position that the restriction which resulted in a lapse of Mr. Smith's presently exercisable voting rights occurred in 1991, when Mr. Smith was restricted from bequeathing his Class A stock to his Estate.

Treasury Regulation § 25.2704–1(b), however, provides that a voting right lapses when the voting right is restricted, not when the ability to transfer the stock to which the voting right is attached is restricted. Plaintiffs' theories are not supported by the Treasury Regulations, including the definition of a lapse of a voting right, and the examples of lapses of voting rights contained in the Treasury Regulations and legislative history, as further discussed below.

*1997*

■ Defendant is correct that the enhanced voting rights of Mr. Smith's Class A shares lapsed on October 26, 1997, the date of Mr. Smith's death. The statute at 26 U.S.C. § 2704 was enacted seven years earlier, on October 8, 1990, and was effective and applicable at the time of Mr. Smith's death, so long as the terms of the statute were met. Prior to his death, Mr. Smith owned Class A shares with the enhanced voting right of 11.64 votes per share. On the date of his death, the Class A common stock automatically converted to Class B common stock, which did not enjoy the enhanced voting right, but had one vote per share. A lapse occurs at the time a presently exercisable voting right is eliminated or restricted. *See* Treas. Reg. § 25.2704–1(b). A voting right which is "presently exercisable" focuses on the holder's ability to vote, and a lapse occurs when the holder's ability to exercise a vote is eliminated. Mr. Smith had not sold his shares to third parties at negotiated prices pursuant to the 1991 restrictions. Mr. Smith, therefore, retained ownership of his Class A shares, and retained their enhanced voting rights, which were still exercisable by Mr. Smith, up until his death, at which point the enhanced voting rights of the Class A shares were eliminated with the conversion to Class B shares. This lapse of voting

rights implicates 26 U.S.C. § 2704. When there is family control of the Company, and the enhanced voting rights lapse at death, then Section 2704 requires that an amount will be included in the decedent's estate, valued as if the voting rights were nonlapsing.

The Treasury Regulations provide examples which illustrate the lapsing of voting rights and the applicability of 26 U.S.C. § 2704. The very first 26 U.S.C. § 2704 example in the Treasury Regulations states:

Prior to D's death, D owned all of the preferred stock of Corporation Y and D's children owned all the common stock. At that time, the preferred stock had 60 percent of the total voting power and the common stock had 40 percent. Under the corporate by-laws, the voting rights of the preferred stock terminated on D's death. The value of D's interest immediately prior to D's death (determined as if the voting rights were nonlapsing) was $100X. The value of that interest *immediately after* death would have been $90X if the voting rights had been nonlapsing. The decrease in value reflects the loss in value resulting from the death of D (whose involvement in Y was a key factor in Y's profitability). Section 2704(a) applies to the lapse of voting rights on D's death. D's gross estate includes an amount equal to the excess, if any, of $90X over the fair market value of the preferred stock determined after the lapse of the voting rights.

Treas. Reg. § 25.2704–1(f), ex. 1. In this Treasury Regulation example, a restriction on voting rights was created by the corporate by-laws. The restriction was similar to the present case in that, on the subsequent death of the preferred stockholder, the voting rights of the preferred stock were to be eliminated. The lapse in the example was not deemed to have occurred with the creation of the restriction, but with the elimination of the voting rights at death. In the present case, the voting rights were presently exercisable up to the point of the death of the holder, when the lapse occurred and an amount should be included in the estate for estate tax purposes reflecting the excess of the value of the stock, as if the voting rights

were nonlapsing over the fair market value of the stock after the lapse of the voting rights.

Example 3 in Treasury Regulation § 25.2704–1(f) also is instructive on when a lapse of voting rights occurs:

> The by-laws of Corporation Y provide that the voting rights of any transferred shares of the single outstanding class of stock are reduced to ½ vote per share after the transfer but are fully restored to the transferred shares after 5 years. D owned 60 percent of the shares prior to death and members of D's family owned the balance. On D's death, D's shares pass to D's children and the voting rights are reduced pursuant to the by-laws. Section 2704(a) applies to the lapse of D's voting rights. D's gross estate includes an amount equal to the excess, if any, of the fair market value of D's stock (determined immediately after D's death as though the voting rights had not been reduced and would not be reduced) over the stock's fair market value immediately after D's death.

Treas. Reg. § 25.2704–1(f), ex. 3. In Example 3, the voting rights were not eliminated, as in above Example 1 of the Treasury Regulation § 25.2704–1(f), and as in the present case, but were reduced to ½ vote per share. As in Example 1, the lapse in Example 3 was not considered to have occurred when the restriction was created by the by-laws. The lapse was deemed to have occurred at death, when the voting rights were actually reduced to ½ vote per share, and were no longer presently exercisable at the full 1 vote per share as they had been prior to the lapse. *See* Treas. Reg. § 25.2704–1(b) ("A lapse of a voting right occurs at the time a presently exercisable voting right is restricted or eliminated."). In the present case, the Class A, enhanced voting right was eliminated upon Mr. Smith's death, or alternatively, Mr. Smith's Class A, enhanced voting right of 11.64 votes per share was restricted, upon his death, to a Class B, reduced voting right of 1 vote per share. Either way, the lapse occurred upon Mr. Smith's death.

These examples from the Treasury Regulations are consistent with the legislative history of 26 U.S.C. § 2704, which contains a similar example. The text of the House–Senate Conference Committee Report stated that:

> The conference agreement provides that the lapse of a voting ... right in a family-controlled corporation or partnership results in a transfer by gift or an inclusion in the gross estate. The amount of the transfer is the value of all interests in the entity held by the transferor immediate before the lapse (assuming the right was nonlapsing) over the value of the interests immediately after the lapse. The conference agreement grants the Secretary of the Treasury regulatory authority to apply these rules to rights similar to voting ... rights.

H.R.Rep. No. 101–964, at 1137 (1990). Immediately after this introduction in the text, the following example was included in the Conference Report:

> *Example 6.*—Parent and Child control a corporation. Parent's stock has a voting right that lapses on Parent's death. Under the conference agreement, Parent's stock is valued for Federal estate tax purposes as if the voting right of the parent's stock were nonlapsing.

*Id.* In this example, as with the Treasury Regulation examples above, Congress identified the lapsing as occurring not at the time of the creation of the restriction on the voting right, but at the time of death.

In reviewing Examples 1 and 3 from the Treasury Regulations and Example 6 from the House Conference Report, defendant argues that:

> those examples clearly state that the lapse occurs at the time the decedent dies and his voting rights are eliminated. There is no reference in any of those examples to a lapse occurring when the by-laws specifying the lapse were adopted. Plaintiff [sic] tries to distinguish the examples in the regulation by arguing that they relate to situations where the lapse restriction was adopted as part of the original incorporation of the business. However, the examples contain no such reference. Further, plaintiff [sic] ignores that the regulation and the legislative history both contain virtually identical examples. Therefore, interpreting the example

in the regulation consistently with the legislative history, it is clear that a lapse occurs upon death when voting rights are eliminated.

Plaintiff [sic] contends that its argument that the lapse occurs when a lapse restriction is adopted, not when the exercise of the vote is restricted or eliminated, is consistent with the legislative history that transfers are to be taxed when made. However, as noted above, the statements the plaintiff [sic] relies upon relate to estate freezes,[12] not lapses of voting rights. The legislative history regarding lapses clearly contemplates that any decrease in value occasioned by a lapse of a voting right upon the death of the holder of the right is to [sic] added back to the estate for estate tax purposes.

. . .

Since the decedent retained full control of the voting rights until his death, any decrease in the value of his stock in 1991, as a result of the amendment of the corporation's by-laws to add the lapse provision, would be minimal. However, as both parties' experts agree, the decrease in the value of his stock upon his death, if the lapse of voting rights is taken into account, is substantial. Interpreting § 2704 as plaintiff [sic] contends, as applying only when a lapse provision is adopted and not when a presently exercisable voting right is eliminated, would render that section meaningless and allow the very abuse Congress sought to prevent. Under plaintiff's [sic] interpretation of the statute, a taxpayer would ensure that the value of his interest in a family-controlled business is substantially reduced for estate tax purposes, as the result of a lapse of voting rights, while incurring little or no gift tax liability at the time the lapse restriction is adopted.

This result is directly contrary to the express intention of Congress that lapses of voting rights in a family-controlled business are to be disregarded in valuing the decedent's interest in that business for estate tax purposes.

■ After careful review and deliberation, the court agrees with defendant's analysis. A lapse occurs, under the statute, 26 U.S.C. § 2704, and Treasury Regulation § 25.2704-1(b), when the present ability to exercise a voting right is restricted or eliminated, not when the restriction or elimination of the voting right is created. In the present case, the lapse of the Class A voting rights occurred upon Mr. Smith's death, with the actual elimination of his enhanced voting rights. Mr. Smith had the unrestricted ability to exercise the enhanced voting rights of his Class A shares until the time of his death. In the words of the Treasury Regulations, his vote was "presently exercisable" up until the time of death, when it was then "restricted or eliminated." *See* Treas. Reg. § 25.2704-1(b). The lapse occurred upon Mr. Smith's death in 1997.

*IRS Written Determinations*

Plaintiffs also cite to, and attempt to rely on, various non-precedential IRS Revenue Rulings, Private Letter Rulings and Technical Advice Memoranda in support of their position that a lapse of voting rights occurs when the lapse restriction is created. A Revenue Ruling is an interpretation of the law indicating how the IRS applies the tax code to particular facts and circumstances. *See Vons Cos. v. United States*, 51 Fed.Cl. 1, 6 (2001) (citing Jacob Mertens, *The Law of Federal Income Taxation* § 1:12, 1–13 (1999)), *order modified*, No. 00–234T, 2001 WL 1555306 (Fed.Cl. Nov. 30, 2001). " 'Unlike a Revenue Ruling which deals with a

---

12. An "estate freeze" was defined in the Informal Senate Report on S. 3209 as:

> a technique that has the effect of limiting the estate tax value of property held by an older generation at its value at the time of the freeze and passing any appreciation in the property to a younger generation. Generally, the older generation retains income from, or control over, the property.
>
> In order to effect a freeze, the older generation transfers an interest in a business or other

property that is likely to appreciate while retaining an interest in the property that is less likely to appreciate. Because the value of the transferred interest increases while the value of the retained interest remains relatively constant, the older generation has "frozen" the value of the property in the transferor's estate.

Informal Senate Report on S. 3209, 136 Cong. Rec. S15629, S15679 (Oct. 18, 1990).

specific factual situation that may affect any taxpayer, a private letter ruling is issued at the request of an individual taxpayer.' " *Id.* at 8 (quoting Jacob Mertens, *The Law of Federal Income Taxation* § 3:87, 3–122). "By comparison, a technical advice memorandum is 'issued in response to a District Director's request arising out of tax return audits,' and is 'furnished as a way of helping Service personnel close cases and establish and maintain consistent holdings through the Service.' " *Id.* at 8–9 (quoting Jacob Mertens, *The Law of Federal Income Taxation* § 1:13, 1–17–18). These Private Letter Rulings and Technical Advice Memoranda are binding only on the taxpayers to whom they are issued. *Id.* at 9 (citing Jacob Mertens, *The Law of Federal Income Taxation* § 1:13, at 1–17); *see also Amergen Energy Co. v. United States*, 94 Fed.Cl. 413, 418 (2010) (" 'Taxpayers other than those to whom such [private letter] rulings or memoranda were issued are not entitled to rely on them.' " (quoting *Lucky Stores, Inc. & Subsidiaries v. Comm'r*, 153 F.3d 964, 966 n. 5 (9th Cir.1998) (citations omitted)) (brackets added)); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 86 Fed.Cl. at 541 n. 43 ("Technical advice memoranda are not binding on the Court of Federal Claims." (citing 26 U.S.C. § 6110(k)(3))). Moreover, 26 U.S.C. § 6110(k)(3) (2006) states that unless otherwise established by regulation, an IRS "written determination may not be used or cited as precedent." [13]

Regarding Revenue Rulings, the United States Court of Appeals for the Federal Circuit has stated, "[A] revenue ruling is entitled to some weight as reflecting the Commissioner's interpretation of the regulation, but does not have the same force as a regulation." *Spang Indus., Inc. v. United States*, 791 F.2d 906, 913 (Fed.Cir.1986) (concluding that the Revenue Ruling under review was ambiguous and did not carry sufficient weight to overcome other considerations by the Federal Circuit); *see also* Treas. Reg. § 601.601(d) (2012) (Revenue Rulings do not have the force and effect of Treasury Regulations, "but are published to provide precedents to be used in the disposition of other

cases, and may be cited and relied upon for that purpose. No unpublished ruling or decision will be relied on, used, or cited, by any officer or employee of the Service as a precedent in the disposition of other cases.").

Although not precedential, "[r]evenue rulings ... 'can provide some guidance.' " *Kerr–McGee Corp. v. United States*, 77 Fed.Cl. 309, 315–16 (2007) (quoting *St. Louis Bank for Coops. v. United States*, 224 Ct.Cl. 289, 624 F.2d 1041, 1050 (1980)). Taxpayers generally may rely on Revenue Rulings in determining the tax treatment of their own transactions, however, caution is in order because facts and circumstances may differ, and the Revenue Rulings may be affected by subsequent tax legislation, Treasury Regulations, court cases and other Revenue Rulings. *See* Treas. Reg. § 601.601(e). "Of course, revenue rulings ... are not binding on this court.... The weight to be given a revenue ruling depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade....' *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), cited in *St. Louis Bank for Coops.*, 624 F.2d at 1051." *Kerr–McGee Corp. v. United States*, 77 Fed.Cl. 309, 315–16 (2007) (citing 26 U.S.C. § 6110(j)(3)); *Xerox Corp. v. United States*, 228 Ct.Cl. 406, 426 n. 20, 656 F.2d 659, 671 n. 20 (1981) ("While these [revenue] rulings are not binding on the Secretary of Treasury or the courts, they may be helpful in interpreting a statute."). As to IRS Private Letter Rulings and Technical Advice Memoranda, the Court of Claims in *Xerox Corp. v. United States*, 228 Ct.Cl. at 408 n. 3, 656 F.2d at 660 n. 3, stated, "Though private letter rulings have no precedential force, they are helpful, in general, in ascertaining the scope of the 'service' doctrine [whether machines were part of a 'service' to customers, or instead were sold or leased to customers, for purposes of entitlement to an investment tax credit] adopted by the [Internal Revenue] Service and in showing that that

---

**13.** "The term 'written determination' means a ruling, determination letter, technical advice

memorandum, or Chief Counsel advice." 26 U.S.C. § 6110 (2006).

doctrine has been regularly considered and applied by IRS.". *See also Amergen Energy Co. v. United States,* 94 Fed.Cl. at 418; *Vons Cos. v. United States,* 51 Fed.Cl. at 6–8, 12 (Private Letter Rulings and Technical Advice Memoranda may not be used as precedent and may not be relied on for their substance, but may be used as an indication of IRS administrative practice, or that the IRS has abused its discretion in issuing different rulings to two directly competing taxpayers (citing, in this last regard, *Int'l Bus. Mach. Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914, 924 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966))); *Buckeye Power, Inc. v. United States,* 38 Fed.Cl. 283, 285 (1997).

*IRS Revenue Ruling 89–3*

Plaintiffs argue that IRS Revenue Ruling 89–3, 1989–1 C.B. 278, 1989 WL 550148, 1989 IRB LEXIS 21 (Jan. 9, 1989), titled "Termination; Transfer; Recapitalization," supports their position that the creation of the lapse restriction under 26 U.S.C. § 2704 was a lapse at the time of creation or adoption of the restriction, and did not occur upon Mr. Smith's death when the Class A, enhanced voting right was eliminated. In Revenue Ruling 89–3, a grantor owned 800 voting shares of a corporation, and a trust for the benefit of grantor's children owned 100 voting shares. *See id.* at *1–2. In a recapitalization of the corporation, the corporation replaced grantor's 800 voting shares with 800 new voting shares, but the voting rights of these shares terminated on the grantor's death. *See id.* at *2. Also under the recapitalization, the trust's 100 voting shares were replaced with 100 new voting shares, which voting rights remained the same and did not terminate on the grantor's death. *Id.* The recapitalization was held to have diminished the value of the grantor's shares, and to have increased the value of the trust's shares by "$100x." *Id.* This was deemed to be a taxable gift from the grantor to the trust beneficiaries. *Id.* at *7.

As to Revenue Ruling 89–3, plaintiffs argue, "[N]otwithstanding that it was only upon the grantor's death that the trust would succeed to control of the corporation, the [Internal Revenue] Service ruled that it was the execution of the recapitalization agreement and not the death of the grantor that triggered the [gift] tax, since it was the recapitalization that effected a shift in value, increasing the value of the stock held by the trust and decreasing the value of the stock held by the grantor." Revenue Ruling 89–3, however, could not have considered 26 U.S.C. § 2704, since the statute was not enacted at the time of the Revenue Ruling. Revenue Ruling 89–3 also explicitly stated that it did not address any issues regarding 26 U.S.C. § 2036(c), titled Inclusion related to valuation freezes, which was the tax code provision replaced by 26 U.S.C. § 2704 in October 1990, when the ruling stated: "This ruling does not address any issues regarding the application of section 2036(c) of the Code to property transfers occurring after December 17, 1987. No inference is intended by this ruling as to the application of section 2036(c) [nor application of section 2036's successor, 26 U.S.C. § 2704] to recapitalizations occurring after December 17, 1987." *Id.* at *7–8.

*IRS Technical Advice Memorandum 93–52–001*

As noted above, Technical Advice Memoranda are binding only on the tax payers to whom they are issued. Moreover, the 1993 Technical Advice Memorandum to which plaintiffs cite addressed issues regarding an employment agreement and whether issuance of stock constituted the lapse of a liquidation right for purposes of 26 U.S.C. § 2704. The matters are unrelated to the lapse of voting rights issues raised by the instant case. *See* I.R.S. Tech. Advice Mem. 93–52001, at *1. In the 1993 Technical Advice Memorandum, the decedent, who died in 1991, owned all 500 voting shares of the Corporation. *Id.* at *2. In December 1988, the decedent gave his child a power of attorney. *Id.* at *1. The child and the child's spouse constituted the board of directors of the Corporation. *Id.* at *2. In November 1990, while the decedent was living, the child and the child's spouse recapitalized the shares of the Corporation, and authorized 10,000 voting shares and 10,000 nonvoting shares. *Id.* Acting on a power of attorney, the child surrendered the decedent's original 500 voting shares to the Corporation, and

exchanged them for 500 nonvoting shares. *Id.* at *2–3. The child also transferred the decedent's property (stocks, bonds, cash, ranch land) to the Corporation in exchange for the remaining 9,500 nonvoting shares. *Id.* at *3. Also in November 1990, the child, acting for the Corporation, executed an employment agreement with child's spouse to manage formerly decedent's, now the Corporation's, cattle ranching business. *Id.* The child's spouse received, what the Technical Advice Memorandum described as, an excessive, gratuitous salary under the employment agreement, and also received two voting shares in the Corporation for his cattle ranching work. *Id.* at *3, 16–20. The two voting shares were important, because no other voting shares were issued out of the 10,000 voting shares authorized, such that the child's spouse held the only voting shares of the Corporation. *Id.* at *6.

The 1993 Technical Advice Memorandum concluded that the decedent, during his lifetime, had transferred to the child's spouse control of the Corporation for less than adequate consideration, and that the employment agreement effectively was a conduit to pass voting control of the Corporation and control of the decedent's property (which became the Corporation's property) to the child's spouse. *Id.* at *8–9. The Technical Advice Memorandum concluded that the decedent, during his lifetime, made a taxable gift to the child's spouse of the two voting shares, control of the Corporation, and a gratuitous salary under the employment contract. *Id.* at *19–20. In the Technical Advice Memorandum scenario, the decedent's actual voting right lapsed during his lifetime, which implicates a gift. In contrast, in the present case, Mr. Smith had the ability to vote his enhanced value, Class A shares up to the point of his death, when his voting rights lapsed, implicating 26 U.S.C. § 2704 for computation of his estate tax.

The 1993 Technical Advice Memorandum also dealt with the issue of a lapse of liquidation rights under 26 U.S.C. § 2704, and concluded that the decedent possessed liquidation rights in his 10,000 nonvoting shares which lapsed, during his lifetime, as a result of the execution of the favorable employment

agreement with the child's spouse and the issuance of the two voting shares to the child's spouse. *Id.* at *27. Since the lapse was based on actual and not prospective events, and occurred during the decedent's lifetime, it was treated as a gift to the child's spouse. *Id.*

*IRS Private Letter Ruling 93–52–012*

Plaintiffs also try to rely on IRS Private Letter Ruling 93–52–012, 1993 WL 538326, 1993 PLR LEXIS 2171 (Sept. 29, 1993), both to suggest restrictions were placed on Mr. Smith's Class A shares in 1986, before 26 U.S.C. § 2704 was enacted, and to support plaintiffs' view that it is the creation of restrictions on the voting rights that is important, not the actual restriction or elimination of presently exercisable voting rights. Not only are Private Letter Rulings not accorded precedential value, but also this particular Private Letter Ruling, 93–52–012, does not assist plaintiffs' argument. In the Private Letter Ruling, restrictions were placed on preferred voting shares prior to October 8, 1990, the effective date of 26 U.S.C. § 2704. *Id.* at *4–5. After the effective date of Section 2704, the shareholder exchanged her preferred voting shares for shares in an affiliated corporation—with similar restrictions. *Id.* at *1–3. The IRS concluded that: "The lapse of voting rights that will occur upon the transfer of preferred shares will not be subject to section 2704 of the Code because the transaction involves a mere change in the form of a restriction that was placed on the interest prior to October 9, 1990." *Id.* at *6. This same analytical approach was employed by this court earlier in this opinion, when the court concluded that under the facts of this case, unlike the facts of the Private Letter Ruling, the 1991 Imlay–Brown Transaction was responsible for substantial changes in the treatment of Class A shares from 1986, changes which were not mere changes in form.

Plaintiffs also suggest that the Private Letter Ruling supports their view that it is the creation of the restriction that is the key, and not the actual restriction or elimination of the enhanced voting right at Mr. Smith's death. In this regard, plaintiffs read too much into the Private Letter Ruling, which

addressed whether Section 2704 was even applicable to the merger of Corporation B into Corporation A described in the Private Letter Ruling. *Id.* at *1. The Private Letter Ruling noted that: "Section 11602(e)(1)(A) of the Revenue Reconciliation Act of 1990, Pub.L. 101–508, provides that section 2701 of the Code applies to transfers occurring after October 8, 1990, and that section 2704 applies to restrictions or rights (or limitations on rights) created after October 8, 1990." *Id.* at *4–5.

*Valuation*

Finally, plaintiffs argue that any theoretical purchaser would be aware that the transferred shares would not have the enhanced voting rights. As a result, a theoretical purchaser would only pay a sum corresponding to the value of Class B shares, since any transferred shares would not have the enhanced voting rights of Class A shares. Plaintiffs state that, "[b]ecause a third party purchaser cannot acquire the disproportionate voting power of the Class A shares since they automatically convert to Class B shares upon sale, the fair market value of the Class A shares under these circumstances is no greater than their Class B counterpart." Plaintiffs, conclude that the "fair market value of Mr. Smith's shares is the same both immediately prior to and after his death[,]" because any purchaser, knowing that the enhanced voting right of the Class A shares would not transfer to the purchaser, would never actually pay the higher price for the Class A, enhanced voting shares,[14] but would only pay the lower price for the Class B, one-share, one-vote, stock.[15] In plaintiffs' words:

> section 2704(a)(2) provides that the amount of the transfer, if any, includable in Mr. Smith's gross estate is determined by comparing (i) the price that Mr. Smith would have realized if, immediately prior to his death, he had sold his 12,424 Class A shares to a third party purchaser, and (ii) the price that the Estate would have realized upon the sale, immediately after Mr.

Smith's death, of 12,424 Class B shares to a third party purchaser. Here, because Mr. Smith's Class A shares would have converted to Class B shares upon any sale to a third party purchaser prior to his death, there is no difference in the amount that could be realized from sales of his stock immediately prior to and immediately after his death, and there is no additional value to be included in Mr. Smith's gross estate.

Plaintiffs' theory is at odds with the explicit valuation provisions of 26 U.S.C. § 2704(a)(2)(A), which states that the value of the stock immediately before the lapse should be "determined as if the voting rights ... were nonlapsing," which would lead to the higher valuation of the shares to be included in Mr. Smith's Estate. Plaintiffs raise the willing buyer-willing seller standard of fair market value, one of the standards raised in Section 2704. *See Pierre v. Comm'r,* 133 T.C. 24, 36 (2009) ("Where Congress has determined that the 'willing buyer, willing seller' and other valuation rules are inadequate, it expressly has provided exceptions to address valuation abuses. See chapter 14 of the Internal Revenue Code, sections 2701 through 2704, which specifically are designed to override the standard 'willing buyer, willing seller' assumptions in certain transactions involving family members."), *supplemented by,* No. 753–07, 2010 WL 1945779 (U.S.Tax Ct. May 13, 2010).

The plain language of 26 U.S.C. § 2704 and its implementing Treasury Regulations, §§ 25.2704–1 through 25.2704–3, direct valuation of shares with lapsing voting rights as if the voting rights were nonlapsing. The examples in the Treasury Regulations and in the legislative history, quoted and discussed earlier in this opinion, support this view of valuation pursuant to Section 2704. Example 1 in Treasury Regulation § 25.2704–1(f) addresses the timing of lapsed voting rights and illustrates how fair market value is calculated. Treasury Regulation Example 1 dem-

---

14. The parties have stipulated that the fair market value of Mr. Smith's Class A shares with enhanced voting rights, as of the date of death, was $30,000,000.00.

15. The parties have stipulated that the fair market value of the Class B shares held by Mr. Smith's Estate as of the date of his death, assuming 26 U.S.C. § 2704 does not apply, was $22,-500,00.00.

onstrates that, when 26 U.S.C. § 2704 is applicable, an amount will be included in the estate for estate tax purposes reflecting the excess of the value of the stock as if the voting rights were nonlapsing, over the fair market value of the stock immediately after the lapse of the voting rights. *See* Treas. Reg. § 25.2704–1(f), ex. 1. Treasury Regulation Example 3, also addressed above regarding the timing of lapsed voting rights, likewise, is instructive on valuation. Treasury Regulation Example 3 includes in a decedent's estate an amount reflecting the difference in value between stock for which voting rights had not lapsed and stock for which voting rights had lapsed after the death of the holder. Treasury Regulation Examples 1 and 3 are consistent with Example 6 in the legislative history to 26 U.S.C. § 2704, contained in the House–Senate Conference Committee Report. In Example 6, also discussed above, the stock also is valued as though the voting rights were nonlapsing for purposes of the estate tax.

Therefore, in order to determine the value of the shares, their value without the voting rights is subtracted from their value with the voting rights. In this regard, the parties have agreed that, if 26 U.S.C. § 2704 applies, which the court has found, the valuation of Mr. Smith's Class A shares, determined as if the enhanced voting rights were nonlapsing, was $30,000,000.00. The parties have further agreed that the valuation of the Estate's Class B shares (Class A shares converted to Class B shares at Mr. Smith's death), was $22,500,000.00.

Plaintiffs also raise 26 U.S.C. § 2703 on the valuation issue, which states:

**(a) General rule.**—For purposes of this subtitle, the value of any property shall be determined without regard to—

(1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or

(2) any restriction on the right to sell or use such property.

**(b) Exceptions.**—Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:

(1) It is a bona fide business arrangement.

(2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.

(3) Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

26 U.S.C. § 2703 (2006).

Plaintiffs argue that the 1991 Imlay–Brown Transaction constituted an arm's length business transaction, which created a restriction on the sale of the shares, the restriction being the automatic conversion of Class A, enhanced, voting right shares to Class B shares without the enhanced voting rights, upon sale of the Class A shares. The general rule of 26 U.S.C. § 2703(a) is that property will be valued without regard to any restriction on the right to sell or use such property. Plaintiffs argue that, although the restriction on sale of the Class A shares normally would be disregarded, the exception to this general rule, in 26 U.S.C. § 2703(b), states that the restriction on sale will be taken into consideration in valuing property when there is a bona fide business arrangement stemming from an arm's length transaction, and not merely an attempt to transfer property to a decedent's family for less than full and adequate consideration. Plaintiffs summarize, "the Company's Articles of Incorporation provided that upon a sale by Mr. Smith of his Class A shares, such stock would automatically convert to Class B shares. As a result, a third party purchaser could acquire only Class B shares and therefore would pay no more for Mr. Smith's Class A shares than such third party purchaser would pay for an equivalent number of Class B shares. This restriction on sale is fully recognized for estate tax purposes under § 2703 . . . ." Plaintiffs conclude that this restriction on the sale of Class A shares should be given full effect. Plaintiffs add that "no additional value would be added to the Estate under § 2704(a)(2) because the fair market value of Mr. Smith's shares is the

**570**

same both immediately prior to and after his death," and "the amount includable in the gross estate for Mr. Smith's shares in the Company is the agreed-upon fair market value of $22.5 million for the 12,424 Class B shares held by the Estate.

Defendant argues, however, that 26 U.S.C. § 2703 does not apply to the present facts and circumstances. The court agrees. Section 2703 addresses, generally, restrictions on the right to sell property. *See* 26 U.S.C. § 2703(a). In defendant's words, "voting rights associated with stock ownership are not property and cannot be sold separately from the underlying stock. Therefore, there could not be a sale of the enhanced voting rights, only a sale of the stock to which those rights related." (citing Stephen M. Bainbridge, *Corporation Law and Economics* 469–72 (2002)). Regardless of the restriction or elimination of Mr. Smith's enhanced voting rights, Mr. Smith's ability to sell or transfer his stock remained. Restrictions on property generally are addressed in 26 U.S.C. § 2703. Restrictions specifically on voting rights, however, are addressed in 26 U.S.C. § 2704. As defendant summarizes, "Section 2703 applies generally to any restrictions on the right to sell property, while § 2704 applies specifically to a lapse of a voting right, the specific situation involved in this case." The statute, 26 U.S.C. § 2704, and the implementing Treasury Regulations dictate that Mr. Smith's shares must be valued as Class A shares, with the value determined as if the enhanced voting rights of the shares were nonlapsing. This valuation was established by Congress and the IRS to govern family-controlled enterprises in which the family exercises control both before and after a lapse of voting rights.

### CONCLUSION

For the foregoing reasons, the court concludes that that statute, 26 U.S.C. § 2704, together with the definitions and enabling Treasury Regulations, apply to the transfer of shares from Mr. Smith to his Estate as of October 26, 1997, the date Rankin Smith, Sr. died. Therefore, plaintiffs' motion for partial summary judgment is **DENIED,** and defendant's cross-motion for partial summary

judgment is **GRANTED.** The Estate of Rankin Smith, Sr. must include a sum reflecting the value of the Class A shares, with their enhanced voting rights nonlapsing. The parties shall continue to confer and submit the information necessary to resolve the other outstanding calculations necessary to conclude the case.

**IT IS SO ORDERED.**